UNITED STATES of America ex rel. Stephen D. FOX, M.D., Plaintiff,

v.

NORTHWEST NEPHROLOGY ASSOCIATES, P.S., et al., Defendants.

No. CS–95–0274–AAM.

United States District Court, E.D. Washington.

Feb. 15, 2000.

William Herbert Beatty, U.S. Atty's Office, Spokane, WA, Maya S. Guerra, Dept. of Justice, Civ. Div., Washington, DC, for U.S.

Robert A. Dunn, McCormick Dunn & Black PS, Spokane, WA, for Relator.

Edward W. Pettigrew, Graham & Dunn, Seattle, WA, Todd Frazier, Frazier Wieland Bataillon & Katz, Omaha, NE, for Defendant Mark Frazier.

J. Ronald Sim, Stoel Rives Boley Jones & Grey, Seattle, WA, for Defendant Mary Anne McDonald, M.D.

Laurence B. Finegold, Finegold Zulauf & Engelhard, Seattle, WA, for Defendant Leo E. Obermiller.

## ORDER RE RELATOR'S MOTION FOR ORDER RE: PERCENTAGE SHARE OF PROCEEDS AND PAYMENT TERMS

McDONALD, Senior District Judge.

**BEFORE THE COURT** is the Relator's Motion For Order Re: Percentage Share Of Proceeds And Payment Terms (Ct.Rec.74).

## I. BACKGROUND

On July 25, 1995, Stephen D. Fox, M.D., filed under seal a complaint pursuant to the False Claims Act (FCA), 31 U.S.C. § 3729–33. (Ct.Rec.3). The complaint alleged Medicare/Medicaid fraud by defendants Northwest Nephrology Associates, Mark R. Frazier, M.D., Mary Anne McDonald, M.D., Leo E. Obermiller, M.D., Jr., M.D., Katherine R. Tuttle, M.D., and John Taylor. Dr. Fox brought the action as a *qui tam* relator pursuant to 31 U.S.C. § 3730(b)(1).

After being granted several requests for continuances, the United States filed a "Notice of Election to Intervene" on January 14, 1998, pursuant to 31 U.S.C. § 3730(b)(2) and (4) (Ct.Rec.31). Upon doing so, the government assumed the "primary responsibility for prosecuting the action." 31 U.S.C. § 3730(c).

On June 12, 1998, the United States filed a complaint (Ct.Rec.34) which, unlike the complaint filed by Dr. Fox, dropped Dr. Tuttle and John Taylor as defendants and, in addition to alleging causes of action under the FCA, alleged common law causes of action for "Payment Under Mistake of Fact" and "Unjust Enrichment." The government's complaint alleged that "[f]rom at least 1989 through 1995," defendants: 1) presented or caused to be presented claims for payment to the United States knowing such claims were false, fictitious, or fraudulent or acted with reckless disregard or deliberate ignorance of the truth or falsity of such claims; 2) made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States knowing such statements or records were false, or acted with reckless disregard or deliberate ignorance of the truth or falsity of such statements or record; and 3) "agreed to participate in a scheme to defraud the Government by upcoding claims submitted to the United States" and "[i]n pursuit of that conspiracy, . . . submitted improper claims for medical services, and . . . caused the United States to make unauthorized payments to defendants . . . ." (Paragraphs 39, 44 and 49 at pp. 9–11).

In January and March 1999, the Honorable Lonny R. Suko, U.S. Magistrate Judge, conducted mediation talks between the United States and defendants Frazier, Obermiller and McDonald. Settlements were reached between the government and each of the three defendants. The terms of the settlement agreement between the government and defendant Frazier are incorporated into a "Stipulation of Agreed Judgment" which is part of the record (Ct.Rec.84). Stipulations are proposed for defendants McDonald and Obermiller, although they are not yet formally part of the record.

Frazier has stipulated to a judgment against him in the sum of $600,000, although the terms of the settlement agreement require him to actually pay $442,000. Pursuant to the terms of her settlement agreement with the United States, defendant McDonald has stipulated to a judgment against her in the sum of $500,000, although she is required to actually pay $375,000. The judgment amounts against Frazier and McDonald will be deemed satisfied if they do not default on their payment obligations. The terms of the settlement agreement with defendant Obermiller require him to stipulate to a judgment of $415,000 and actually pay that amount to the United States.

Each settlement agreement specifies an amount from which the United States obligates itself to pay a percentage to the relator (Dr. Fox), to be set by this court, pursuant to 31 U.S.C. § 3730(d)(1). Article XII of the settlement agreement with Frazier indicates this amount is $413,736 ($442,000 less $28,264 payable to the State of Washington as reimbursement for false Medicaid claims). Furthermore, Article XII specifies that the United States will not be obligated to pay the relator unless and until it receives payment from Frazier and that "[w]ithin a reasonable time of receiving each of the payments (i.e., pension funds payment and each quarterly payment), the United States will pay Relator a sum equal to such percentage as is set by the Court . . . of the amount paid by Frazier."

Article XIII of the settlement agreement with McDonald specifies that $362,-248 [1] is the amount from which the court

---

1. $375,000 less $11,752 paid to the State of Washington as reimbursement for false Med-icaid claims.

should award a percentage to the relator pursuant to 31 U.S.C. § 3730(d)(1). It also specifies that the United States will not be obligated to pay the relator unless and until it receives payment from Mc-Donald and that "[w]ithin a reasonable time of receiving each of the payments (i.e., the net sale proceeds from 1712 East 27th Street house, each quarterly payment, and the Balloon Payment), the United States will pay Relator a sum equal to such percentage as is set by the Court ... of the amount paid by McDonald."

Article XIII of the settlement agreement with Obermiller specifies that $403,-566[2] is the amount from which the court should award a percentage to the relator pursuant to 31 U.S.C. § 3730(d)(1). It also specifies that the United States will not be obligated to pay the relator unless and until it receives payment from Obermiller and that "[w]ithin a reasonable time of receiving each of the payments (i.e., the initial payment, each quarterly payment, net sale proceeds from the sale of the Priest Lake, Idaho home, and the Balloon Payment), the United States will pay Relator a sum equal to such percentage as is set by the Court ... of the amount paid by Obermiller."

## II. DISCUSSION

31 U.S.C. § 3730(c)(2)(B) provides:

The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action [the relator] if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

31 U.S.C. § 3730(d)(1) provides in relevant part:

If the Government proceeds with an action brought by [a private person rela-

tor], such person shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending on the extent to which the person substantially contributed to the prosecution of the action.... Any payment to a person ... shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.[3]

The United States proposes that Fox receive 17.5% of the settlement proceeds actually received by the United States or, at the very most, 19% of those proceeds. The total amount of the proceeds appears to be $1,239,550 ($362,248 from McDonald + $403,566 from Obermiller + $413,736 from Frazier + an additional $60,000 from Frazier which the United States indicates has become available due to the recent liquidation of Frazier's pension plan). 17.5% of this amount is $216,921.25. 19% is $235,514.50.

Fox wants the statutory maximum 25%. Furthermore, he contends this percentage should be calculated based on the amount of the judgments, rather than the actual amounts paid over to the government, and that his share should be paid in full from the initial payments made by each of the defendants, rather than requiring him to receive a pro rata share as payments are received by the government from each of the defendants. According to Fox, he should be paid 25% of $1,515,000 ($600,000 judgment against Frazier + $500,000 judgment against McDonald + $415,000 judgment against Obermiller) which is $378,750, and he should receive that in a lump sum from the government upon the

**2.** $415,000 less $11,434 paid to the State of Washington as reimbursement for false Medicaid claims.

**3.** Relator Fox has reached settlements with each of the three defendants regarding pay-

ment of his expenses, including attorney's fees and costs. Therefore, he has withdrawn his "Motion for Order Requiring Defendants to Pay Expenses, Attorney's Fees and Costs." (Ct. Rec. 72 and 93).

government's receipt of the initial payments from each of the defendants.

In sum, Fox contends the settlement agreements between the government and each of the defendants are not "fair, adequate and reasonable" insofar as their treatment of him.[4]

### A. Percentage Share to Come From Judgment Amounts or Amounts Actually Received?

■ The relator is to receive at least 15% but not more than 25% of "the proceeds of the action or settlement of the claim, depending on the extent to which [he] substantially contributed to the prosecution of the action...." Here, Fox contends the government's position that "proceeds" should be limited to the actual amount of cash received by the government is incongruent with the purpose and language of the False Claims Act (FCA).

For this proposition, Fox cites an unpublished FCA case, but does not discuss the holding of the case because of the local rule which prohibits citing to unpublished cases. LR 7.1(g)(2). Fox also cites various authority holding that "proceeds" means something more than just cash, money, or tangible assets.

Each of the settlement agreements contain provisions that in the event the United States receives amounts in excess of the "Settlement Amount," it will pay the relator such percentage of the additional amount as has been set by the court. (See Article XII of Frazier Agreement, Article XIII of Obermiller and McDonald Agreements). This includes any additional amounts received by the United States in collecting the judgment amounts should that be necessary because of a default in payment of the settlement amounts.

The judgment amounts are of value and therefore, technically qualify as "proceeds." However, the value of the judgments will only be realized if there is a default on the settlement amounts. In the event of a default, the government will receive additional funds up to the judgment amounts and pay the assigned percentage to the relator. Until then, the court is not persuaded it should award Fox a percentage of proceeds that have not, and may never be, received by the government.

A review of several FCA cases indicates the critical consideration is what is "received" by the government. In *U.S. ex rel. Merena v. Smithkline Beecham Corp.*, 52 F.Supp.2d 420 (E.D.Pa.1998), the relators contended they were entitled to a *qui tam* share of the proceeds received by the states as reimbursement for Medicaid payments made by the states. The court disagreed, observing that Medicaid programs are state programs authorized and partially financed by federal law. According to the court, while a false claim submitted to and paid by a state's Medicaid program indirectly results in a loss to the federal government, it is not a false claim submitted to the United States. *Id.* at 439–40. The court held that "[a] qui tam share may be obtained from the Government [United States] only out of the proceeds of the settlement received by the Government." *Id.* at 440 (emphasis added). The United States was never entitled to receive the amounts to be paid to the states. *Id.*

In the case before this court, each of the settlement agreements provide that a certain portion of the settlement amounts will be paid to the State of Washington for Medicaid payments made by the State because of false billings submitted by the

---

**4.** Fox does not contend the judgment amounts are unreasonable. Indeed, Fox has signed a document indicating his approval of the settlement agreement between the government and defendant Frazier, reserving his objections to the amount the government proposes to distribute to him and how it proposes to distribute it to him. Counsel for Fox and counsel for defendant Frazier have submitted a stipulation whereby Fox agrees to dismiss with prejudice all of his claims against defendant Frazier. The court approves of the stipulation and has signed the order dismissing Fox's claims against Frazier.

defendants. As noted above, the settlement agreements provide that the amounts paid to the State are excluded from the settlement amounts on which the relator's percentage share is to be calculated. Fox does not specifically argue that the amounts payable to the States should be included in determining the amount from which his percentage share should be calculated.

Other FCA cases indicate that in determining the relator's share, the court looks to the amount actually received by the United States. In *U.S. v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158 (S.D.Fla.1990), the defendant agreed to pay $160,000 to the Treasurer of the United States pursuant to a settlement. The court awarded the relator 5% of that amount ($8,000).

In *U.S. ex rel. Burr v. Blue Cross & Blue Shield*, 882 F.Supp. 166, 169 (M.D.Fla.1995), the relator contended the actual settlement between the United States and Blue Cross was for $25 million. The court disagreed, finding that Blue Cross had agreed to pay the United States $10 million in settlement of the action. The court was not persuaded that the value of sums received by Blue Cross from third parties in several collateral claims should be added to the figure. In addition to the settlement between the United States and Blue Cross, the "global settlement" included a compromise and settlement of an administrative claim by Blue Cross against Health Care and Financing Administration and a claim against GTE Data Services, Inc. The court found the settlement of these collateral claims was incidental to the *qui tam* action and therefore, should not be considered in determining the relator's percentage of the settlement proceeds.

In *U.S. ex rel. Coughlin v. I.B.M. Corp.*, 992 F.Supp. 137, 142 (N.D.N.Y.1998), IBM/Lockheed agreed to provide certain warranty repair work, if such work became necessary before July 1, 1997. If any warranty work was performed, the value of that work would be added to the settlement valuation. The record, however, demonstrated that no such warranty work ever became necessary and therefore, the court rejected the relators' contention that the obligation to perform warranty work should be added to the settlement valuation. Accordingly, the court found the value of the settlement was limited to the $200,000 cash payment made to the government and awarded the relators 15% of that amount.

Here, if it is necessary for the government to seek collection of the judgment amounts because of a default in payment of the settlement amounts, Fox is guaranteed he will get a share of that recovery. That is sufficient to protect his interest in the judgment amounts. At this time, however, all he is entitled to is a share of the payments on the settlement amounts which the defendants are obligated to make and the government is entitled to receive. Therefore, the court finds that the "proceeds" in this case currently amount to $1,239,550 and the relator's percentage share should be determined based on that amount.

### B. When Should Relator Receive His Share?

 The terms of the settlement agreements allow the defendants to pay off the settlement amounts in payments stretching over a five year period.

After the liquidation of his pension plan and the payment received by the United States from that liquidation, defendant Frazier is obligated to make quarterly payments of $11,100 over a five year period.

Defendant Obermiller is to make a $50,000 initial payment to the United States, followed by quarterly payments of $12,500 over a four year period and a balloon payment due no later than October 20, 2004 to satisfy any balance which is still owing at that time. In the meantime, Obermiller is obligated to attempt to sell a house he owns located on Priest Lake, Idaho and turn over the sale proceeds to the United States.

Defendant McDonald is to pay the United States up to $100,000 upon the closing of the sale of her Spokane home at 1712 East 27th Street. If the net sale proceeds are less than $100,000, she is obligated to pay over those proceeds to the United States, plus $10,000, but not more than a total of $100,000. Thereafter, McDonald is to make quarterly payments of $4,500 to the United States over a five year period, with a balloon payment of $185,000 due no later than the end of the five year period.

The settlement agreements provide that the relator is to receive his percentage share from each of these payments as they are received by the United States. Fox objects to this because: 1) the payments are to be made without interest and without any guarantees; 2) the initial payments to be received from two of the defendants are large enough to pay his share in full, regardless of the percentage he is awarded; 3) the government proposes to make him wait for his share while it has agreed to immediately pay the defendants' own attorneys and reimburse others from the initial settlement monies received; 4) McDonald and Obermiller have been allowed to retain retirement accounts in which there are enough funds to satisfy the entire judgment amounts against them and furthermore, "[t]hese accounts arguably were funded as a result of the Defendants' unlawful conduct;" 5) the government's proposal "is without statutory support, is unreasonable, and ignores the fact that the Relator in this case has suffered substantial harm, which the proposed settlements do not address;" and 6) the proposed periodic payments to the relator are subject to delay because of the necessity of issuing him a check from the Federal Treasury.

There is no statute or case law dictating how payment is to be made to a relator. It is simply a question of reasonableness. When the United States intervenes in a case, as it did here, the False Claims Act

recognizes it is the United States which controls the litigation. This makes perfect sense considering it is the government, not the relator, who is the victim of the alleged false claims.

According to 31 U.S.C. § 3730(c)(1), "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." The government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the government of the filing of the motion and the court has provided the person with an opportunity for hearing on the motion. 31 U.S.C. § 3730(c)(2)(A). As noted above, the government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines after a hearing that the proposed settlement is fair, adequate, and reasonable under all the circumstances. 31 U.S.C. § 3730(c)(2)(B). The government can ask the court to limit the relator's participation in the litigation after the government has chosen to intervene. 31 U.S.C. § 3730(c)(2)(C).

While the False Claims Act recognizes that the relator should be awarded for initiating litigation which ultimately has a successful result, it also recognizes that the primary interest at stake in such litigation belongs to the government.

Fox notes that he did not participate in the mediation talks before Magistrate Judge Suko.[5] He says he was not invited to participate and that the United States ignored his "concerns and observations." The United States was not obligated to invite the relator to participate in the mediation talks. Nor was the United States obligated to present the relator's "concerns and observations" at those talks. While it may not always be a wise course of action, the United States can choose to

---

**5.** Apparently Fox was present during the one day mediation session in January 1999, but was not present during the three day session

which occurred in March 1999 and produced the settlement agreements.

make the relator a minimal participant in the litigation once the United States has opted to intervene.

Because Fox did not participate in the settlement talks, he was not privy to the discussions which took place concerning the financial means of the defendants. As a result, the court is somewhat skeptical of his criticisms of agreements he took no part in helping to fashion. Fox's primary concern is with his own personal recovery.[6] While that may be understandable, the False Claims Act requires the court to give due regard to the best interests of the government. The government maintains that "[t]he terms represented in the proposed settlement agreements are the best terms the United States could obtain from the defendants and have the approval of Magistrate Judge Suko."

The settlement agreement between the United States and defendant Frazier anticipates that funds which are currently held in the court registry as a result of liquidation of Frazier's pension fund ($237,797), along with $265,402 which Frazier has at an investment firm, will be paid out as follows: 1) all outstanding expert witness fees in the criminal action involving Frazier (approximately $1,500); 2) taxes, penalties and interest payable to the Internal Revenue Service as a result of the liquidation of the pension plan; 3) penalties and interest payable to the State of Nebraska as a result of the liquidation of the pension fund; 4) administrative fees owing to the Clerk of the United States District Court for the Eastern District of Washington (approximately $300); 5) $15,000 to Tarutis & Barron, P.S., Seattle, Washington; 6) $18,900 to the law firm of Graham & Dunn, Seattle, Washington[7]; and 7) $220,000 to the United States[8], of which

the United States will pay $28,264 to the State of Washington as reimbursement for false Medicaid claims.

The government proposes to pay Fox his assigned percentage share out of the amount that is left after all of these deductions. Fox complains it is unfair that he be required to wait to receive his share while all of these other entities are paid. Presuming that approximately $200,000 will be left from which to calculate the relator's percentage share, that share will be substantially larger than the amounts which are to be paid for expert witness fees, court clerk fees, and fees payable to Tarutis & Barron and Graham & Dunn. Under the government's proposed percentage range of 17.5% to 19%, the relator would receive between $35,000 and $38,000 of the $200,000 left over.

Furthermore, if Frazier does not timely pay the taxes, penalties and/or interest due to the United States and the State of Nebraska because of the liquidation of his pension plan, that could have consequences jeopardizing his ability to make the quarterly payments called for by the settlement agreement. In turn, that could jeopardize Fox's anticipated cut of the quarterly payments. It appears that it is in Fox's best interests for Frazier to square things away with federal and state taxing authorities.

The payments to be made to the State of Washington have already been discussed. Those funds do not belong to the federal government. Those funds need to be paid to the State pursuant to the settlement agreement as reimbursement for false Medicaid claims. Therefore, the relator's share should not come out of those funds.

---

**6.** In his affidavit, Fox states "I do not formally protest the *amount* of the settlements proposed for any of the defendants. I do however strenuously object to the repayment terms as they affect the relator's share." (Paragraph 69)(Emphasis in Text).

**7.** Edward Pettigrew, Esq., of the Graham & Dunn firm, has represented Frazier throughout these proceedings. The $18,900 repre-

sents legal fees. The settlement agreement provides that both Tarutis & Barron and Graham & Dunn will submit outstanding invoices to the court for review. These have not yet been submitted to the court.

**8.** There are additional provisions which apply in the event the amount is less than $220,000 or exceeds $220,000.

Fox and his counsel contend the settlements between the government and the defendants are structured in a way that defendants are left with insufficient funds to fully and adequately address the fees, expenses and costs owed to Fox pursuant to 31 U.S.C. § 3730(d). As noted above, Fox has reached settlements with all of the defendants for payment of fees, expenses and costs under § 3730(d). Defendant Frazier's share is $12,858.83 which he has already paid to Fox. While Fox complains about the adequacy of these settlements he has reached with each of the defendants, neither he or his attorney have made any showing exactly how they are inadequate to cover Fox's attorney's fees, costs and expenses. Fox's attorney does not say how much time he has spent on this case nor detail the expenses and costs which have been incurred. The attorney's affidavit does not include a copy of his billing records pertaining to this case. Fox has not submitted any documentation regarding expenses incurred by him. In the absence of such information, this court has no way of determining whether the settlements between the government and the defendants shortchange Fox with regard to reimbursement of attorney's fees, costs and expenses.

Furthermore, while Fox complains that the settlements between the government and the defendants leave the defendants with insufficient funds to pay his attorney's fees, costs and expenses, he simultaneously argues that the settlements effectively give the defendants an "interest free investment loan during a ten-year bull market" and do not require two of the defendants to liquidate their qualified retirement accounts. Fox also contends that defendant Obermiller "still maintains a substantial income." Fox appears to take inconsistent positions.

The court fails to find anything manifestly or grossly unjust regarding the provisions in the settlement agreements that the relator will be paid his share as the United States receives its share. The court finds no reason why the relator and the United States should not be treated alike considering their respective interests in the litigation.

## C. What Percentage?

The relator is entitled to at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which he substantially contributed to the action. The United States and Fox employ Department of Justice guidelines in arguing for the percentage they believe is warranted. Fox says he meets all of the criteria for an increase in percentage share, except that he did not go to trial. He says he does not meet any of the criteria for a decrease in the percentage.

Fox contends the mere fact this case did not go to trial should not preclude him from receiving the maximum statutory amount of 25 percent. He cites *U.S. Ex Rel. Pedicone v. Mazak Corp.*, 807 F.Supp. 1350, 1352 (S.D.Ohio 1992), in which the court found the relator's share should not depend on whether the case is settled or tried. The court observed that the language of the statute did not make any distinction in providing for a 25 to 30% share whether or not the matter was tried. 31 U.S.C. § 3730(d)(2) provides that in cases where the government does not intervene in the action, the relator shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall not be less than 25% nor more than 30% of the proceeds of the action or settlement and shall be paid out of the proceeds.

In *Pedicone,* the court awarded the relator the maximum 30% of the proceeds of the settlement which had been reached between the relator and the defendant. The court found the relator had pursued the action "at considerable personal and professional expense to himself" and that an award of 30% "would encourage other potential whistleblowers to take risks similar to those taken by the *qui tam* Plaintiff in this matter to expose fraud against the United States."

■] 31 U.S.C. § 3730(d)(1) does not state that a maximum award of 25% in a case where the government opts to intervene depends on whether the case goes to trial. It says only that the award depends on the extent to which the relator substantially contributed to the prosecution of the action. Therefore, § 3730(d)(1) does not, on its face, prohibit a maximum 25% award in cases where a settlement is reached prior to trial, so long as the relator's contributions otherwise justify such an award.

■] In *U.S. Ex Rel. Burr,* cited above, the court stated it was persuaded that "the maximum recovery is reserved for situations where the relator actively and uniquely aids the government in prosecution of the case." 882 F.Supp. at 168. This court believes that an important factor in determining whether a relator has actively and uniquely aided the government is if the matter proceeds all the way through trial. It should be a rare occurrence that the maximum percentage is awarded in a case that has settled short of trial. The maximum percentage should be used to encourage and reward relators for whom it is necessary to participate in significant and complex pre-trial matters followed by trial.

■ Here, Fox initiated the lawsuit in 1995. The government intervened in January of 1998. A scheduling order issued in November 1998 setting trial for June 2000. The Magistrate Judge conducted settlement conferences in January and March of 1999 resulting in settlement. Fox did not participate in these settlement conferences.

Fox contends that it is through his efforts that settlement was made possible. While the court has no reason to doubt that Fox's reporting of the fraud was extremely helpful to the government and facilitated settlement, it was not the only thing that led to settlement. The government conducted the negotiations which led to settlement. An important element of those negotiations was determining what the defendants could reasonably pay. The government facilitated settlement by not insisting on bankrupting the defendants. As a result, there will be funds available to pay the government and Fox.

While the court will not award Fox the maximum 25% amount, he is clearly entitled to an award in excess of the minimum 15%. The government states there are four reasons (DOJ criteria) justifying an award above 15%: 1) the filing of the *qui tam* complaint stopped the fraud at Northwest Nephrology Associates (NNA); 2) Dr. Fox provided details of the fraud to the United States; 3) the government did not have knowledge of the specific fraud; and 4) the relator provided some assistance and cooperation to the government.

On the other hand, the government contends Fox did not report the fraud until after his employment at NNA was terminated; he did not make any attempt to stop NNA's billing practices while he was employed there; his complaint did not warn of a safety concern; he was not required to testify as a witness; his case did not go to trial; his complaint did not expose a nationwide practice of fraud; and he did not fully cooperate with the government's investigation as exemplified by his failure to make monitored phone calls to the other NNA physicians, his refusal to speak with the government at all until he was given immunity, and his insistence for a period of six months that all contact with him be made through his attorney.

The government contends there are two specific reasons for decreasing the percentage: 1) Dr. Fox participated in the fraud and 2) he substantially delayed in reporting the fraud or filing the complaint. Fox vehemently disputes that he knowingly participated in the fraud or delayed in reporting it.

Fox contends he was fired from his job at NNA as "a direct result of having raised issues of questionable billing practices he suspected were being engaged in by the Defendants." According to Fox, he was suspicious of the billing practices at NNA, but it was only after he left NNA in January 1994 and began working for the

Rockwood Clinic in Spokane that he confirmed the NNA billing practices were in fact fraudulent. It appears that in June of 1994, Dr. Fox first contacted an attorney (Leslie R. Weatherhead, Esq.) who then wrote to the U.S. Attorney's Office offering Fox's cooperation in exchange for immunity from prosecution. (Ex. A to Supplemental Affidavit of Fox). In early August 1994, the U.S. Attorney's Office confirmed it would take no criminal action against Fox in connection with the billing practices of his former associates at NNA (Ex. C to Supplemental Affidavit of Fox).

The fact Fox may not have spoken to government authorities before obtaining immunity is not a significant consideration in determining his percentage share.[9] Fox filed his *qui tam* complaint in July 1995 and it was not until he did so that he was obligated by the False Claims Act to disclose to the government all of the material evidence in his possession. When a private person files a *qui tam* complaint, he is required to serve on the government a copy of the complaint and "written disclosure of substantially all the material evidence and information the person possesses." 31 U.S.C. § 3730(b)(2).

In his supplemental affidavit, Fox says that government investigator Gerry Gibson asked him in September 1995 to make monitored phone calls to the NNA physicians. According to Fox, he had not spoken to any of those physicians in over eight months. He declined to make the phone calls, citing concern for his personal safety and the safety of family members. Fox says Gibson became angry and threatened him with prosecution. Based on the current record, the court cannot find that Fox's refusal to make the monitored calls was patently unreasonable.

Fox denies that he did not have direct contact with Gibson after refusing to make the monitored phone calls. Fox contends there were numerous telephone conversations, transmitted faxes and/or mailed letters between he and Gibson. However, Fox's attorney acknowledges that following Fox's refusal to make monitored phone calls, the government was directed to communicate with Fox by way of his attorney. The attorney claims this did not end the communication between Fox and Gibson. (Affidavit of Robert Dunn).

Fox says his disclosure statement (filed along with his *qui tam* complaint) raised a "safety concern" in that it advised of poor medical judgments being made by defendant Frazier. While Frazier's competency was not directly at issue in the investigation performed by the government, it appears a side benefit of the investigation was that it led to Frazier no longer practicing medicine, assuming Frazier was indeed an "impaired" physician.

Fox points out that a settlement was reached between the government and Dr. Katherine Tuttle in November 1998 and that he received 22% of the proceeds, although he believes he was entitled to more.[10] Fox contends there is no valid reason for the government to offer him any less from the settlements with the other defendants and indeed, that he should be awarded more than 22% because of his efforts in bringing about these settlements.

Exhibit G to Fox's first affidavit is an August 5, 1998 letter from the government's attorney to Fox's attorney extending the 22% offer with regard to the Tuttle settlement. The 22% amounted to $28,-

---

9. In his supplemental affidavit, Fox says he met with Assistant U.S. Attorney Jim Crum on July 27, 1994 without any immunity protection and reviewed his (Fox's) "billing concerns with him." The declaration of Gerry Gibson, the government investigator, states it his "understanding that Dr. Fox would not discuss the case with the United States Attorney's Office until he received immunity." As Fox points out, Gibson's statement is hearsay.

10. While Fox named Tuttle as a defendant in his *qui tam* complaint, Tuttle was not included as a defendant in the government's complaint. All claims against Tuttle were dismissed pursuant to a stipulation approved by the court in March 1999 (Ct. Rec. 57 and 59).

366.80. The government extended the offer with the understanding that "the 22% relator's share percentage has no bearing on the determination of the relator share percentage set for any of the other defendants' settlement or judgment amounts." The government asserted that the relator's share should be determined after examination of the specific facts surrounding each of the other settlements. The government indicated it was in its best interests to proceed with the Tuttle settlement, including the relator's 22% share, in order to free up resources to prosecute the remaining defendants. Furthermore, the government indicated that the cost of arguing the disputed margin in the relator share dispute "would certainly approach and perhaps surpass the amount of that margin."

The 22% share Fox received from the Tuttle settlement was a significantly smaller dollar amount compared to what he stands to receive from the government's proposed 17.5% to 19% share of the Frazier, Obermiller and McDonald settlements. Therefore, it appears there is a reasonable basis why the government chose to offer Fox 22% of the Tuttle settlement, but is not willing to offer the same with regard to the other settlements. It is also noted that unlike the Frazier, Obermiller and McDonald cases, the Tuttle case was not mediated before Magistrate Judge Suko over a four day period (one day in January 1999 and three days in March 1999). It appears the government expended a much more significant effort in obtaining the settlements with Frazier, Obermiller and McDonald.

Fox contends the Tuttle settlement left Tuttle with inadequate resources to fully compensate him for attorney's fees, costs and expenses. While a settlement was reached with Tuttle regarding those items, Fox's attorney contends it was "a substantial discount from what Dr. Fox believed he was entitled to as reimbursement and compensation for his costs, fees, and ex-

penses." Once again, however, neither Fox or his attorney provide an itemization of their costs, fees, and expenses with regard to the Tuttle matter and therefore, there is no way of telling whether they were inadequately compensated.

There is little doubt that the efforts of Dr. Fox were significant in bringing about the settlements with the defendants. It is reasonable to believe those settlements could deter future instances of health care fraud. The court has no reason to doubt Fox has endured some personal and professional hardship because of his involvement in this matter.

Based on the current record, the court finds 20% to be a reasonable relator share and is inclined to award Fox that percentage of the settlement proceeds received by the government.[11] However, the court will allow Fox and/or the government an opportunity to present oral argument and/or evidence (testimony, documents, etc.) to the court regarding the relator share, **with the understanding that in no event will the court award the statutory maximum (25%).** Said hearing is scheduled for **March 13, 2000 at 1:30 p.m. in Yakima.**

No later than **March 1, 2000,** the government and Fox will advise the court if a hearing is necessary. If a hearing is necessary, the parties will exchange exhibit and witness lists and file the same with the court no later than **March 1, 2000.**

### III. CONCLUSION

The court tentatively awards Dr. Fox 20% as his relator share of the proceeds to be received by the government pursuant to the settlement agreements concluded with defendants Frazier, Obermiller and McDonald. The relator share will be paid out of the actual amounts received by the government, as they are received by the government.

---

11. Based on the current amount of proceeds ($1,239,550), 20% results in a relator share of $247,910.

IT IS SO ORDERED. The Clerk is directed to enter this order and forward copies to counsel.