UNITED STATES of America, et al., Plaintiffs,

v.

GENERAL ELECTRIC, Defendant.

No. C–1–90–792.

United States District Court, S.D. Ohio, W.D.

Dec. 4, 1992.

Gerald Kaminski, Cincinnati, OH, John Phillips, Los Angeles, CA, James Helmer, Cincinnati, OH, for plaintiffs.

John Beatty, Cincinnati, OH, Roger Whitten, Washington, DC, for defendant.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court for consideration of an award to be made to Chester Walsh in accordance with 31 U.S.C. § 3730. Testimony and evidence were presented to the Court on November 2, 1992, November 3, 1992, and November 30, 1992.

In addition to the foregoing, the Court also has considered the deposition of Steven P. Kosky, II, a Special Agent with the Federal Bureau of Investigation, who led the investigation of General Electric from November 19, 1990. The deposition was conducted under somewhat unusual circumstances. The United States had objected to the deposition of Agent Kosky based upon a fear of disclosure of ongoing investigations related to this matter. In order that the Court have the benefit of Agent Kosky's testimony, counsel for Mr. Walsh proposed that they not be present, but rather submit a series of written questions for the Court to ask. Only Russell Kinner and Gerald Kaminski, Attorneys for the Department of Justice, were present during such questioning. The resulting deposition transcript has been held *in camera* and under seal. It will be made available to the United States Court of Appeals for the Sixth Circuit should this matter be appealed. The following determination by the Court is based upon the presentation of all evidence, including Agent Kosky's deposition.

### I. INTRODUCTION

31 U.S.C. § 3730 and its predecessors sometimes are referred to as the "False Claims Act" or the "Whistleblower Statute." The statute essentially provides for an award to any person who brings to the attention of the United States evidence of fraud pursuant to 31 U.S.C. § 3729. This section and its predecessors have had a long history. The original statute was enacted by the Congress of the United States in March 1863, several months before the Battle of Gettysburg. There is historical evidence that a critical position known as Little Roundtop was almost overrun by Confederate troops because of a lack of Union rifles and ammunition. Armament which had been purchased from private suppliers arrived in boxes that contained only sawdust[1].

In its current form, § 3730 provides as follows, in pertinent part:

> (d) Award to Qui Tam[2] plaintiff.—(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

That section of the statute goes on to state:

> Where the action is one which the court finds to be based primarily on disclosures of specific information ... relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds....

It is with both the historical background and the specific terms of the appropriate statute that the Court turns to the facts in this case.

### II. FACTS

Beginning in December 1984, Chester Walsh, an employee of the General Electric Company, was assigned to duties in the State of Israel as the manager of the overseas aircraft operation in Israel. During the period of time that he was so assigned, he learned that funds of money provided by the United States for specific projects sought by the government of Israel in fact were being diverted to other uses. What

---

1. Coddington, *The Gettysburg Campaign.*

2. "Qui tam" is an abbreviation of a Latin phrase which may be translated as, "Who sues on be-

half of a king as well as for himself." Black's Law Dictionary, 1251 (6th ed. 1990).

Mr. Walsh apparently did not know, or did not learn until somewhat later, was that funds not only were diverted, but apparently were also embezzled by an Israeli Air Force Colonel (later an Israeli Air Force General) known as Rami Dotan, and by a high-ranking General Electric official by the name of Herbert Steindler.

Mr. Walsh began accumulating documents indicating the diversion of money to what he assumed to be different projects. In mid 1987, while on a visit to the United States, he consulted counsel. After returning to Israel, he continued to accumulate documents which he ultimately "smuggled" out of Israel to Switzerland, where he had been reassigned, and then to the United States. The documents in this case are quite numerous. The vast bulk of them were produced by Mr. Walsh. In November 1990, General Dotan was arrested; shortly thereafter this action was brought and held under seal. Information thereupon was supplied to the United States Department of Justice as required by the statute. In August 1991, approximately nine months later, the Department of Justice elected to proceed with the lawsuit. In the interim Mr. Walsh had numerous conferences with the FBI. In December 1990, he agreed to wear a body microphone whereby he obtained evidence from three other employees of General Electric.

In the words of Agent Kosky, Mr. Walsh's contribution was substantial. The actual language is as follows:

> QUESTION: As a result of your participation and perceptions, what is your opinion about how substantial Mr. Walsh's contribution was to your investigation and the litigation of this action?
> ANSWER: The government knew absolutely nothing that had gone amiss at General Electric. General Electric had taken substantial measures to cover it up for a space of two years. I have no reason to believe that anyone within General Electric would have ever told us besides Mr. Walsh. Mr. Walsh brought us the only information that we had. We built on it through our own efforts and the fruits of the criminal and civil cases that were settled last summer are a direct result of what Mr. Walsh brought us and *would have come from no other source to my knowledge to this day* (emphasis added).

Transcript, Kosky Deposition at pp. 88–89.

In July 1992, this matter was compromised by General Electric's payment of $59,500,000 to the United States in settlement of the civil suit, plus payment of a fine of $9,500,000 in a criminal matter brought by the United States Attorney for the Southern District of Ohio. Testimony presented to the Court indicated that counsel for Mr. Walsh had recommended that the United States settle the action for $60,000,000.

The Court notes in passing that this entire transaction actually resulted in a "profit" to the United States. In addition to the $59,500,000 received from General Electric, the United States also recovered $6,158,301 from bank accounts where General Dotan and Mr. Steindler had secreted the money embezzled from the United States. Evidence presented to the Court indicated that the direct losses to the United States totaled $41,656,598. The excess of collection over such losses amounted to $18,627,202. The Court currently is holding $14,875,000, which represents the maximum that may be awarded to Mr. Walsh. The "bottom line" appears to be that the United States of America will realize at least a $4,000,000 "profit."[3] (Deft.Ex. XX).

While funds were improperly taken from a number of different projects, there is one that should be described in more detail. A fund of money was provided for the construction of "Test Cell No. 5" on an Israeli air base. This installation was intended to test GE engines in the field. From time to time progress reports would be issued and money would be authorized accordingly. The reality was that Test Cell No. 5 never existed. Another employee of General Electric by the name of Alaric Fine became suspicious of the progress reports and

---

**3.** As noted by Mr. Walsh's counsel, whatever the costs incurred by the United States in the investigation of this matter, they presumably were more than covered by this amount.

sought to inquire into the real progress of Test Cell No. 5. He was frustrated in his efforts by representatives of the Israeli Air Force, who denied him access to the air base where the test cell supposedly was located. When he finally reported his suspicions to General Electric, he was removed from his position with the program in Israel and assigned to another area. Whether or not such transfer was a "demotion" is a matter of opinion. Alaric Fine serves as an example of what happened to General Electric employees who in fact called attention to irregularities in company procedures. Mr. Fine simply reported irregularities to the persons committing them. The evidence suggests that neither he nor Mr. Walsh was certain how high the improper conduct went.

■ It is the crux of the argument by the United States Department of Justice that Mr. Walsh waited too long; that had he supplied the information available to him when he became aware of the truth, he arguably could have reduced the loss to the United States. Mr. Walsh in response points out what happened to Mr. Fine and also his fear of personal harm by General Dotan. That fear was not irrational. Exhibit 81 presented to the Court consists of an indictment returned against General Dotan at a court martial proceeding. The seventh count of that indictment contains the following language:

> The accused, being an officer of the IDF (Israel Defense Forces), with a rank of Brigadier General during the years 1989, 1990, or close to that time period, in Israel, entered into a conspiracy with a person to commit outside of Israel an act which is included in the definition of a felony, i.e. he gave Master Sergeant Frank the sum of U.S. Fifty Thousand Dollars ($50,000 US) and conspired with him to use that money to kidnap Mr. Pail, *to injure him and threaten him with the intent to prevent him from testifying* (emphasis added).

General Dotan pleaded guilty to all counts of the indictment including the above, and currently is serving a term in an Israeli prison.

There has never been an assertion in this proceeding that Mr. Walsh personally profited from the fraud. The most that the Department of Justice can assert is that he "should have" revealed this information earlier. It is very easy to fall into the trap of "should have." Lawyers particularly are prone to use that argument when after the benefit of excellent hindsight a different method of procedure can be devised. It may be that Mr. Walsh's fear of General Dotan was not warranted. It may be that the example of Mr. Fine did not give Mr. Walsh good reason to pause. It may be that Mr. Walsh could have found a better method for smuggling the documents out of Israel at an earlier date. All of the foregoing are possible and perhaps might have changed the results. Perhaps.

There is no dispute that Mr. Walsh provided information whereby the United States recovered in excess of Seventy Million Dollars. There is no dispute that the documents that Mr. Walsh smuggled from Israel detailed the assertions that he was making, and that without them it would have been difficult, if not impossible, to sustain a case against General Electric.

Chester Walsh, as an individual, is of very little importance in this action. Whether he moved as expeditiously as possible, whether he should have shared his information earlier, whether he was disloyal to General Electric, really is not before this Court.

It is instead the very concept of "whistleblowers" that appears to be in issue. The pattern of behavior in these cases by the Department of Justice always has been a mystery. The use of a qui tam plaintiff is nothing new. The Internal Revenue Service has for decades offered a monetary reward to anyone who provides information regarding tax evasion. It is a standard practice of law enforcement agencies to pay confidential informants. It is customary in entrapment cases for a jury to be advised that "criminal activity is such that stealth, stratagems and undercover agents are necessary weapons in the arsenal of the police officer." *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed.

413 (1932). No one likes "snitches," but they can be valuable. In view of their widespread use, it is worthy of note that the Department of Justice has considered such individuals as adversaries rather than allies. This is not the first case where this Court has noted the antagonism of the Justice Department to a whistleblower[4]. The reason continues to be unknown, but the attitude is clear.

Mr. Walsh performed a service to the United States. Whistleblowers in general perform services to the United States. It is at least naive to believe that an appeal to "patriotism" alone will cause disclosures of fraud. The Congress of the United States has determined that whistleblowing should be encouraged by monetary rewards. This case is a classic example. Fraud on the United States was disclosed by Mr. Walsh. The money was returned in full, and even if the relator is awarded the maximum under the statute, the United States still will show a net profit.

■ Despite the foregoing, the Court is impressed by one argument of the United States. Awards of the full 25 percent fee should be reserved for only those individuals whose conduct in disclosing the fraud is virtually flawless. While the Court is unwilling to second guess Mr. Walsh's actions under the circumstances confronting him, the evidence does indicate that he was aware of the fraud long before he filed his complaint, that he failed to report his suspicions to anyone at General Electric, or to corroborate Mr. Fine's suspicions when given an opportunity to do so, and that his silence facilitated the continuation of the fraud for some period of time. Despite Mr. Walsh's subsequent and exemplary cooperation in bringing this matter to light, the Court therefore agrees that a slight reduction below the maximum award is warranted.

In accordance with the foregoing, the Court believes that an appropriate award to this plaintiff is twenty-two and one-half percent (22½%) of the amount realized by the United States in the civil settlement with General Electric. Mr. Walsh therefore is awarded the sum of Thirteen Million Three Hundred Eight-seven Thousand Five Hundred Dollars ($13,387,500). The Special Master in this case hereby is directed to pay that sum of money to Mr. Walsh on December 14, 1992, to pay all other expenses of the Special Master as may be directed by the Court, and to remit the balance to the United States of America.

IT IS SO ORDERED.

---

**4.** See *Gravitt v. General Electric,* 680 F.Supp. 1162 (S.D. Ohio 1988).