**UNITED STATES of America, ex rel., Karen JOHNSON–POCHARDT, Plaintiff,**

v.

**RAPID CITY REGIONAL HOSPITAL; Dr. Larry P. Ebbert; Oncology Associates; and Dakota West Radiation Oncology, P.C., Defendants.**

No. CIV. 01–5019–KES.

United States District Court, D. South Dakota, Western Division.

Feb. 26, 2003.

Bonnie P. Ulrich, John O. Holm, U.S. Attorney's Office, Sioux Falls, SD, Michael F. Hertz, Michael D. Granston, David T. Cohen, Department of Justice Commercial Litigation Branch, Washington, DC, Rexford A. Hagg, Whiting, Hagg & Hagg, Rapid City, SD, David L. Lillehaug, Lillehaug Law Office, Minneapolis, MN, for Plaintiffs.

Vanya Sue Hogen, Faegre & Benson, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER AWARDING FEE TO RELATOR

SCHREIER, District Judge.

[¶ 1] Plaintiff–Relator, Karen Johnson–Pochardt, moves for an order awarding her a relator's fee of 25 percent of the proceeds from the settlement between the United States and defendants Rapid City Regional Hospital, Dr. Larry P. Ebbert, and Oncology Associates. The United States opposes the motion and moves the court to award Johnson–Pochardt 16 percent of the proceeds.

### BACKGROUND

[¶ 2] Johnson–Pochardt's interest in cancer started when her close friend was diagnosed with the disease in 1982. Johnson–Pochardt became involved in Junior League and helped start the Race for the Cure, a fundraiser for breast cancer research. She then sought employment in the area of cancer education and treatment. In 1991, she became the education coordinator at McKennan Hospital's cancer center in Sioux Falls, South Dakota. Although education coordinator was an entry-level position, Johnson–Pochardt advanced to become director of the center by 1993. During the summer of 1996, she became the administrator of the Rapid City Regional Hospital (RCRH) Cancer Care Institute (CCI). The positions at McKennan and RCRH were among the top three cancer care administration positions in South Dakota.

[¶ 3] In the early 1990s, defendants Dr. Larry Ebbert and Oncology Associates (OA) entered into a lease arrangement with RCRH. Under the original three-year lease, Dr. Ebbert paid $19,000 per year to rent 400 square feet of space, while RCRH paid him a medical director fee of $20,000 per year, and allowed OA to use hospital services such as staff, equipment, and supplies. When the three-year lease expired,

CCI moved into a new building and OA expanded. OA continued paying $19,000 per year in rent, and Dr. Ebbert continued to receive $20,000 per year in addition to the use of other hospital goods and services.

[¶ 4] After being the director of CCI for less than one year, Johnson–Pochardt spoke to Dr. Ebbert's practice consultant in May 1997, about the possible illegality of the lease arrangement. Upon learning of Johnson–Pochardt's concerns, Dr. Ebbert wrote a letter to Johnson–Pochardt's supervisor suggesting that Johnson–Pochardt's responsibilities be limited to public education and marketing. When her supervisor refused, both Johnson–Pochardt and her supervisor sustained personal insults from Dr. Ebbert and his wife. During this time, Johnson–Pochardt was referred to as a "rising star" at RCRH, and the Joint Commission of Accredited Healthcare Organizations labeled her an exceptional department leader. Her department was similarly recognized as an exemplary department.

[¶ 5] Johnson–Pochardt then queried hospital managers, including RCRH's CEO and vice president, whether RCRH was complying with the Stark Law and the Anti–Kickback statute because it did not appear that RCRH was receiving payment equal to the fair market value for the space and services. She was informed that a new lease was being negotiated. Because of her concern about the lease arrangement, Johnson–Pochardt personally analyzed the amount OA paid for its space and services in September of 1997. Her report concluded that OA paid $19,000 a year for renting space and receiving services that were actually worth $136,441.06.

[¶ 6] In 1999, Johnson–Pochardt spoke to an attorney who told her to continue to press RCRH to solve the problems inter-

nally. If the illegalities persisted, the attorney advised her to present the case to the government. In 1998 and 1999, she sought and obtained written legal advice for RCRH from two national law firms that specialized in health care law for hospitals. In 2000, an outside consultant advised RCRH to "take swift action to correct the problems." RCRH did not make any changes to its policies or the lease. In February 2000, Johnson–Pochardt presented RCRH's CEO with a spreadsheet, indicating that RCRH had subsidized OA by over one million dollars. RCRH still took no action.

[¶ 7] In October of 2000, the CEO's secretary told Johnson–Pochardt that she was removing files from the CEO's office that related to the formation of CCI. Johnson–Pochardt informed her that she would take the files. The files revealed that since CCI's founding, RCRH had intended to subsidize OA. Documents demonstrated that RCRH's CEO had negotiated the lease and that its vice president had signed it. At that point, Johnson–Pochardt recognized the futility of further seeking internal solutions.

[¶ 8] Johnson–Pochardt then consulted two attorneys, David Lillehaug and Rex Hagg, in November 2000. After researching her allegations for four months, she commenced a qui tam action and prepared a detailed disclosure statement. The United States Attorney was served with the complaint in March 2001. Two Assistant United States Attorneys (AUSA) and representatives from the Department of Health and Human Services (HHS) and the Internal Revenue Service (IRS) conducted a full-day interview of Johnson–Pochardt on April 10, 2001, in Sioux Falls, South Dakota. Johnson–Pochardt provided them with a multitude of documents and supplemented these documents two days later. These documents included forms indicating that OA was billing Medi-

care using a Place of Service Code 11, "office," which constituted "upcoding" on the site of service. During the course of the next year and a half, Johnson–Pochardt and her attorneys continued to provide the government with information to assist the government's investigation. Johnson–Pochardt filed an amended complaint on October 5, 2001.

[¶ 9] In February 2002, the qui tam complaint was revealed to RCRH and OA. The defendants hired attorneys from two of the largest firms in Minneapolis, Minnesota. OA's attorneys sent a letter to the United States Attorney's office in May of 2002, which argued that OA was not engaging in upcoding their bills by billing Medicare under the "office" code. In June, Johnson–Pochardt and her attorneys responded to the United States and provided detailed research and analysis of the violations alleged by Johnson–Pochardt and suggested legal strategies to challenge OA's position. The government and its investigators interviewed Johnson–Pochardt several more times during 2002.

[¶ 10] Immediately after Johnson–Pochardt's initial notification to the government, the government began conducting an investigation to determine whether or not it should intervene. The United States filed its first ex parte motion for an extension of the time to intervene on June 1, 2001. The court granted an extension. The government made ten subsequent motions for an extension of time to intervene, filing its final motion for extension on December 18, 2002. An extension was granted each time. These extensions prolonged the action over two years.

[¶ 11] On August 7, 2002, the government informed Johnson–Pochardt and her attorneys that it had reached a settlement of $525,000 with OA. Settlement negotiations were scheduled to commence the following day, August 8, 2002, with RCRH. Johnson–Pochardt, Lillehaug, and Hagg

were present in Minneapolis, Minnesota, for these negotiations. When the attorneys for RCRH objected to their presence, Johnson–Pochardt and her attorneys remained in a separate conference room and conferred periodically with AUSA John Holm. The negotiations lasted all day. RCRH offered $500,000 and refused to increase its offer. After face-to-face negotiations broke off, telephonic negotiations between AUSA Holm and RCRH's counsel continued. The United States then notified RCRH that it would intervene rather than seek another extension of the seal. The parties then reached a settlement in principle in September of 2002.

[¶ 12] On December 18, 2002, the parties reached a written settlement in which RCRH agreed to pay the United States six million dollars. This is the largest recovery nationwide under the Stark Law and the largest settlement under the False Claims Act to date in the District of South Dakota. The government elected to intervene in the action the following day. The settlement occurred over two years after Johnson–Pochardt filed the qui tam action.

[¶ 13] Throughout this time, Johnson–Pochardt's job and responsibilities changed dramatically. On October 1, 2001, she accepted a position as Director of Cancer Education and Standards at RCRH. She described the position as "at best, a lateral move." This newly-created position prevented her direct involvement in the relationship between RCRH and the oncology physicians. After disclosing the complaint to RCRH in February 2002, Johnson–Pochardt described working relationships as "correct but distant." She reached a severance agreement with RCRH and resigned from her position on December 17, 2002. Her resignation from RCRH also required her to resign from numerous cancer-related boards and organizations.

[¶ 14] As director of CCI at RCRH, Johnson–Pochardt earned $78,300 in addition to full health benefits, life insurance, and a full retirement plan. Her salary and benefits totaled over $90,000 per year, which placed her in the top one percent of wage earners in South Dakota. There are only two other comparable positions in South Dakota; neither is located in Rapid City, and neither currently has an opening.

[¶ 15] A newspaper article printed in the Argus Leader in Sioux Falls, South Dakota, in December 2002, identified Johnson–Pochardt as the whistleblower and explained the defendants' actions and the qui tam lawsuit. The article contained several quotes from Dr. Ebbert that negatively reflected Johnson–Pochardt's actions and motivations. For instance, he stated, "This employee, had she not filed this [qui tam action], almost certainly would not be here [as director of CCI] anyway." Dr. Ebbert subsequently wrote a letter to the editor of the Argus Leader, on December 30, 2002, criticizing the author of the story and Johnson–Pochardt. He stated that the lawsuit enabled Johnson–Pochardt and her attorneys to "line their own pockets."

[¶ 16] Johnson–Pochardt also suffered significant effects in her personal life as a result of the two-year qui tam action. She and her husband closed their business in Rapid City to help their financial stability. Johnson–Pochardt avoided attending church and other social and community activities in which she was previously very active. Her marriage and other relationships suffered. She experienced several physical conditions as a result of stress. Furthermore, since the action was confidential and most documents were under seal for two years, Johnson–Pochardt was forced to hide her actions from her family and friends. She could not speak candidly about either her actions or RCRH's. All discussions with her attorneys were held at night, on weekends, or holidays to avoid detection by any co-workers at RCRH.

[¶ 17] RCRH paid Johnson–Pochardt a severance fee upon her resignation in December 2002. Her attorneys received $75,000 from the defendants pursuant to 31 U.S.C. § 3730(d) of the False Claims Act, which requires the defendants to pay costs and attorney fees.

## DISCUSSION

### [¶ 18] 1. Background of the False Claims Act

[¶ 19] The False Claims Act states that a relator should receive between 15 percent and 25 percent of the proceeds of the action or settlement of the claim. 31 U.S.C. § 3730(d)(1). The amount is based on "the extent to which the person substantially contributed to the prosecution of the action." *Id.* A 15 percent minimum share is usually considered a finder's fee. *United States ex rel. Alderson v. Quorum Health Group Inc.*, 171 F.Supp.2d 1323, 1331 (M.D.Fla.2001). "This incentive compensation is paid to a relator 'even if that person does nothing more than file the action in federal court.'" *Id.* at 1332 n. 29 (quoting 132 Cong. Rec. H9382–03 (Oct. 7, 1986) (statement of Rep. Berman)).

[¶ 20] Congress allowed for increased rewards to "encourage assistance from the private citizenry that can make a significant impact on bolstering the Government's fraud enforcement effort." *Id.* at 1331 (quoting S.Rep. No. 99–345 at 8 (1986)). Thus, greater assistance results in greater rewards

> In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the court should award a percentage substantially above 15% and up to 25%.

*Id.* at 1332 (quoting 132 Cong. Rec. H9382–03 (Oct. 7, 1986) (statement of Rep. Berman)). The maximum reward is reserved for relators who "actively and uniquely assist the government in the prosecution of the case." *United States ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.*, 882 F.Supp. 166, 168 (M.D.Fla.1995). The actual percentage awarded is within the court's discretion. *Quorum Health*, 171 F.Supp.2d at 1331.

### [¶ 21] 2. Determining the Relator's Share

#### [¶ 22] a. The Senate Factors

[¶ 23] When passing the False Claims Act, the Senate discussed factors to consider in determining the relator's share, including the significance of the information provided by the relator, the relator's contribution to the final outcome, and whether the government previously knew such information. *Id.* at 1332 (quoting S.Rep. No. 99–345, at 28 (1986)). The first factor, a contribution of significant information, encompasses the development of factual information, documentary evidence, and legal arguments. *Quorum Health*, 171 F.Supp.2d at 1332. Johnson–Pochardt provided all three sources of information.

#### [¶ 24] i. Contribution of Significant Information

[¶ 25] Because of her position as director of CCI throughout the action, Johnson–Pochardt was privy to documents, conversations, and information that she relayed to the government. She spent hours reading and copying documents after working a full day at the hospital. She initially gave the government a stack of documents, in chronological order, that was nearly one foot high. *See United States v. General Elec.*, 808 F.Supp. 580, 583 (S.D.Ohio 1992) (relator provided the important documents necessary for sustaining a case against the defendant). Some of these documents were nearly ten

years old, including the suspect lease agreement signed by RCRH's CEO and vice president. Johnson–Pochardt analyzed the fair market value of the lease arrangement between RCRH and OA and personally calculated the amount of subsidies OA received. She candidly completed numerous interviews with the government and its agencies, with one interview lasting a full day. She and her attorneys countered RCRH's arguments and strategies and suggested methods of challenging its position. The large amount, the detailed nature, and the steady flow of information indicate that Johnson–Pochardt significantly contributed to the government's knowledge of RCRH's and OA's activities. *See Quorum Health,* 171 F.Supp.2d at 1332 (relator's initial allegations and knowledge of hospital accounting practices formed the basis for a successful qui tam action and amounted to significant information).

### [¶ 26] *ii. Contribution to the Result*

[¶ 27] The second Senate factor examines the contribution of the relator to the result of the action. This factor is discussed in detail in the *Quorum Health* decision. *Id.* There the relator revealed that the hospital where he worked routinely prepared inconsistent Medicare reimbursement cost reports. *Id.* at 1325. During the course of the action, the relator hired two law firms one had expertise in health care and the other in False Claims Act actions. *Id.* at 1326–27. The relator and his attorneys met with Department of Justice (DOJ) officials several months after filing the complaint. *Id.* at 1327. The relator prepared a cost analysis that detailed the hospital's activities, and his attorneys distributed it to DOJ. *Id.* The relator hired an accounting firm that confirmed the hospital's accounting irregularities, which formed the basis of the fraud claim. *Id.* When the government decided not to intervene, the relator and

his attorneys persuaded the government to continue with the investigation. *Id.* at 1328. After six years, the government intervened and litigation ensued. *Id.* The relator's attorneys remained active in trial preparation. *Id.* at 1329. When the action was successfully mediated, the relator and his attorneys participated in these negotiations. *Id.* at 1330.

[¶ 28] Like the relator in *Quorum Health,* Johnson–Pochardt and her attorneys made significant contributions to the result in this case. Information from Johnson–Pochardt essentially established the claims brought against the defendants. For two years, Johnson -Pochardt assisted the government in building a case against the defendants, and her persistence ultimately persuaded the government to intervene. Johnson–Pochardt hired two attorneys: local counsel who was familiar with RCRH, its decision makers, and employment law, and a former United States Attorney for the District of Minnesota, who had supervised several qui tam actions. Because the defendants hired two of the largest law firms in Minneapolis, Johnson–Pochardt's choice of the former United States Attorney for the District of Minnesota was instrumental to the success of the settlement negotiations.

[¶ 29] Johnson–Pochardt personally analyzed figures to determine whether violations were occurring at RCRH. Her attorneys researched the type of damages recoverable under the Stark Law and whether treble damages were available for this claim under the False Claims Act. Both Johnson–Pochardt and her attorneys participated in the settlement negotiations and helped negotiate the sizable settlement. *See United States ex rel. Pedicone v. Mazak Corp.,* 807 F.Supp. 1350, 1353 (S.D.Ohio 1992) (relator deserved large percentage of the significant settlement which he negotiated and which benefitted the United States).

[¶ 30] *iii.* *Government's* *Prior* *Knowledge of the Information*

[¶ 31] The third factor looks at whether the government previously knew the information provided by the relator. There is no evidence that the government would have discovered the defendants' actions in this case had Johnson–Pochardt not spoken out. Indeed, she spoke to RCRH personnel about the lease arrangement, she alerted Dr. Ebbert's practice consultant about the possible violations, and she presented an analysis to both the CEO and vice president of RCRH. No one at RCRH came forward to correct the situation or report the violations Johnson–Pochardt singularly exposed RCRH's actions. *See General Elec.*, 808 F.Supp. at 582 (the relator provided the government's only information since there was no reason to believe any other employee of defendant would have revealed the illegal diversion of funds). The government was neither conducting an investigation nor planning an investigation of RCRH or OA, prior to speaking with Johnson–Pochardt.

[¶ 32] The government argues that it could have subpoenaed much of the information provided by Johnson–Pochardt "had we known of the alleged conduct." But, in fact, the government had no knowledge of the alleged conduct, so it had no reason to subpoena any documents. The government also states that "there was nothing of a unique nature in the documents that the United States would have known only through the Relator." Regardless of whether the information was unique, the government only knew that such information existed because of the relator. Indeed, "the United States possessed no awareness from any source of [the defendant's] practices." *Quorum Health*, 171 F.Supp.2d at 1333. Johnson–Pochardt's information revealed illegal activity of which the government had no prior knowledge, and the government received a substantial settlement precisely because of her revelations. *See United States ex rel. Fox v. Northwest Nephrology Assoc.*, 87 F.Supp.2d 1103, 1112 (E.D.Wash.2000) (relator's award increased because government did not previously know of the fraud).

[¶ 33] **b. DOJ Guidelines**

[¶ 34] The Department of Justice has established internal criteria for calculating the relator's share. The list consists of items to consider for a possible increase[1] or a possible decrease[2] in the percentage. Attorneys and courts frequently refer to the guidelines to determine the relator's share, as they contain common sense con-

---

1. Items to consider for a possible increase in the percentage include: (1) The relator reported the fraud promptly; (2) When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor of the Government; (3) The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the Government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The relator provided extensive, first-hand details of the fraud to the Government; (7) The Government had no knowledge of the fraud; (8) The relator provided substantial assistance during the investigation and/or pretrial phases of the case; (9) At his deposition and/or trial, the relator was an excellent, credible witness; (10) The relator's counsel provided substantial assistance to the Government; (11) The relator and his counsel supported and cooperated with the Government during the entire proceeding; (12) The case went to trial; (13) The FCA recovery was relatively small; (14) The filing of the complaint had a substantial adverse impact on the relator.

2. Items to consider for a possible decrease in the percentage include: (1) The relator participated in the fraud; (2) The relator substantially delayed in reporting the fraud or filing the complaint; (3) The relator, or relator's counsel, violated FCA procedures: (a) complaint served on defendant or not filed under

siderations guided by experience. *Quorum Health*, 171 F.Supp.2d at 1333. *E.g.*, *Northwest Nephrology Assoc.*, 87 F.Supp.2d at 1112 (court evaluated many of the DOJ factors to determine relator's share).

[¶ 35] The guidelines, however, are not definitive factors for a court to follow; they are "merely internal standards and not federal regulations." *Quorum Health*, 171 F.Supp.2d at 1333. While containing relevant considerations, the guidelines:

> fail to establish a coherent theory under which to determine the relator's share. Notably, the guidelines, or at least some of their underlying premises, contradict one another.... The DOJ guidelines suffer other theoretical problems and are noticeably unhelpful. In effect, the DOJ guidelines are merely an indiscriminate enumeration of more or less obvious factors, unaccompanied by any indication of comparative weight and more useful as a checklist for negotiation than a rule of decision in adjudication.

*Id.* at 1334 n. 34. Several criteria are nonetheless useful considerations when determining the relator's share. In this case, the court will refer to portions of the guidelines to highlight the reasoning behind the relator's award.

[¶ 36] *i. DOJ Guidelines (1) and (2)—Reporting Promptly and Notifying a Supervisor or the Government*

[¶ 37] The government argues that Johnson–Pochardt should have reported the fraud earlier, since it took her four years to come forward. This delay, however, does not undermine the promptness of Johnson–Pochardt's qui tam suit. "It is very easy to fall into the trap of 'should have.' Lawyers particularly are prone to use that argument when after the benefit of excellent hindsight a different method of procedure can be devised." *General Elec.*, 808 F.Supp. at 583. The circumstances indicate that the time span should not militate against increasing her award.

[¶ 38] First, Johnson–Pochardt needed time to determine whether she actually believed the defendants were violating federal law. She is not a lawyer and was not familiar with the nuances of the False Claims Act, the Stark Law, or the Anti–Kickback statute. A false accusation would likely jeopardize her employment and prevent her from investigating further. It took her less than a year to alert RCRH personnel of the apparent violations. Second, Johnson–Pochardt needed to address these concerns within RCRH's infrastructure prior to filing an action with the government. Thus, she spoke to RCRH managers, Dr. Ebbert's practice consultant, and eventually, to RCRH's CEO and vice president. Third, Johnson–Pochardt attempted to remedy the situation without filing an action by obtaining outside legal advice for RCRH and providing the information to RCRH. When none of these internal queries changed the practices, she filed a qui tam action.

---

seal; (b) the relator publicized the case while it was under seal; (c) statement of material facts and evidence not provided. (4) The relator had little knowledge of the fraud or only suspicions; (5) The relator's knowledge was based primarily on public information; (6) The relator learned of the fraud in the course of his Government employment; (7) The Government already knew of the fraud; (8) The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation; (9) The case required a substantial effort by the Government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or with little need for discovery; (11) The FCA recovery was relatively large.

[¶ 39] Her process of reporting the violations, which took four years, was completely reasonable. She followed the natural chain of command in hopes that RCRH would correct the matter without having to resort to a lawsuit. Furthermore, Johnson–Pochardt came forward while she was still employed by RCRH. This placed her at risk for both retaliation and termination. *See General Elec.*, 808 F.Supp. at 583 (court did not reduce relator's share based on relator's rational fear of retaliation which caused him to not immediately report the fraud). *Cf. United States ex rel. Coughlin v. Int'l Bus. Machs. Corp.*, 992 F.Supp. 137, 142 (N.D.N.Y.1998) (relator's share reduced because he did not report the suspected fraud until after his retirement). Johnson–Pochardt's report of the violations was as prompt as could be expected under the circumstances. She attempted to stop the fraud upon learning of it and reported it to the necessary parties in control who could address the violations. When these attempts proved unsuccessful, she reported the violations to the government. These actions support an increase in her award.

[¶ 40] *ii. DOJ Guidelines (3), (6), (7), (8), and (9)—Causing the Fraud to Stop; Providing Extensive, First-hand Details, Government Had No Knowledge of Fraud; Substantial Assistance by Relator; Ability to Be a Good Witness*

[¶ 41] Johnson–Pochardt's qui tam action caused the defendants to stop their illegal activities. As detailed in the previous section, Johnson–Pochardt provided extensive, first-hand details of the fraud to the government. The government had no previous knowledge of the fraud. Although Johnson–Pochardt did not have to testify, she was candid, honest, and helpful throughout all of her interviews with the government and other agencies. These

factors further indicate the appropriateness of increasing her relator's share.

[¶ 42] *iii. DOJ Guideline (10)—Relator's Counsel Substantially Assisted the Government*

[¶ 43] Johnson–Pochardt's attorneys substantially assisted the government's investigation and the settlement negotiations. *Cf. United States v. Covington Tech. Co.*, 1991 WL 643048, *1 (C.D.Cal. 1991) (relator's share not increased because he did not substantially participate in the negotiations leading up to settlement). As the previous section demonstrates, her attorneys played a significant role in encouraging the government to intervene and in attaining the sizable settlement. "The record establishes that [Johnson–Pochardt's] counsel contributed significantly (in both quality and quantity) and at certain moments, crucially to the case. That contribution deserves manifest and telling weight in determining the proper relator's award." *Quorum Health,* 171 F.Supp.2d at 1335.

[¶ 44] *iv. DOJ Guideline (11)—Support and Cooperation with the Government*

[¶ 45] Furthermore, Johnson–Pochardt and her attorneys continually supported and cooperated with the government's investigation as detailed in the previous sections. The government argues that Johnson–Pochardt is entitled to less because she refused to consent to extend the time for the government to elect to intervene. The government claims these refusals forced it "to agree to shorter extensions ... and to waste its own time and this Court's time on a large number of short extension requests, when a smaller number of extension requests would have been preferable." Regardless of whether Johnson–Pochardt agreed to longer extensions

or whether the government had to file additional requests for shorter extensions, the action was pending, in confidence, for nearly two years. By statute, the government has sixty days to intervene. Opposing ten extensions spanning two years does not demonstrate resistance to the government's investigation.

[¶ 46] During this entire time, Johnson–Pochardt was still employed at RCRH and daily faced discovery, retaliation, or possible termination. Furthermore, because the qui tam complaint was sealed, her attorneys were concerned that the defendants may destroy important documents if they did not receive notice of a lawsuit. Johnson–Pochardt also could not discuss any of her actions with her family or friends. It is therefore understandable that she would oppose further prolonging the action. In light of these considerations, her resistance to extensions of time will not reduce her award.

[¶ 47] In all other ways, Johnson–Pochardt cooperated with the government. The previous sections examine the extent of Johnson–Pochardt and her attorneys' support of and cooperation with the government. Their zealous support contributed to the government's election to intervene and to the largest settlement ever obtained under the Stark Law. This factor supports an increase in Johnson–Pochardt's share in the settlement proceeds. *Cf. Int'l Bus. Machs.*, 992 F.Supp. at 142 (relator received only 15 percent because he "vigorously opposed" the settlement).

[¶ 48]   *v.   DOJ Guideline (14)—Substantial Adverse Impact on Relator*

■   [¶ 49]   "[A] qui tam relator suffers substantial harm and the qui tam provisions of the FCA are intended to remedy that harm." *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir.1993). Such harm includes "severe emotional strain due to the discovery of his unwilling involvement in fraudulent activity," substantial ramifications to the relator's employment, and financial burdens. *Id.* It is often difficult, if not impossible, to measure the harm suffered. "[Q]ui tam relators face the Hobson's choice of keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal." *Id.* As a result, the False Claims Act attempts to compensate the relator for any harm suffered and for the substantial time and effort expended in pursuing the action. *Id.*

[¶ 50]   The qui tam action wreaked havoc on Johnson–Pochardt's life. She and her husband sold their business to ensure some financial stability. Her relationships with co-workers and her work environment deteriorated drastically. Ultimately, she lost a well-paying job in a field that she loved, in addition to losing full health benefits, life insurance, a retirement plan, and a position on numerous boards and organizations. Her chances of being hired to a similar position within South Dakota are greatly reduced. *See Mazak*, 807 F.Supp. at 1353 (relator received highest possible percentage of settlement because pursuing the action caused considerable personal and professional harm).

[¶ 51]   The confidentiality of the proceedings made it impossible to speak openly with family and friends. Johnson–Pochardt avoided activities she valued, such as church and her class reunion. *See Quorum Health*, 171 F.Supp.2d at 1337 (court considered financial hardship and confidentiality burden when increasing relator's award). She and her husband separated on two different occasions. She lost hair and suffered other physical ailments. "The court attaches much importance to the oppressive burden borne by [Johnson–Pochardt] in initiating and sustaining this case." *Id.* Furthermore, "even a cursory

review of applicable history demonstrates the formidable personal and legal difficulties encountered by [Johnson–Pochardt] during and because of this litigation, none of which dissuaded [her] from promptly disclosing ... the alleged fraud and doggedly pursuing [her] claims." *Id.* Thus, Johnson–Pochardt deserves a greater share in the proceeds of the settlement to compensate her for the personal burdens she endured. *Cf. Blue Cross & Blue Shield,* 882 F.Supp. at 169 (maximum percentage not appropriate where relator suffered no personal or professional hardship).

[¶ 52] *vi. DOJ Guideline—Amount of Settlement*

▬▬ [¶ 53] The False Claims Act conditions the relator's share on the extent of his or her substantial contribution, not on the amount ultimately recovered:

> The recovery of a qui tam relator is intended to remedy the harm he suffered in several ways: by distancing the relator from the fraud and rewarding him for his involvement in the government's fight against unlawful activity; by compensating the relator for any harm he suffered with respect to his employment; and by compensating the relator for the substantial time and expense involved in bringing a qui tam action.

*NEC Corp.,* 11 F.3d at 138. Congress did not establish "a sliding scale to graduate the available percentages as the size of the recovery increases.... [T]he conspicuous absence of an explicit cap or mechanism to taper the available percentage argues forcefully against the government's position that the size of the recovery is a factor warranting consideration." *Quorum Health,* 171 F.Supp.2d at 1335 n. 37.

[¶ 54] In this case, the government argues that a 16 percent share in this sizable settlement will make Johnson–Pochardt a wealthy woman. It further cites her severance agreement with RCRH and the defendants' payment of $75,000 attorney's fees as evidence that both she and her attorneys have already received substantial compensation. While the court has taken these matters into consideration, it finds even more persuasive the substantial nature of Johnson–Pochardt's and her attorneys' persistent efforts, the quality and quantity of the information they provided, and their contributions to the settlement negotiations. Both Johnson–Pochardt and her attorneys deserve compensation that correlates to their significant contribution rather than a reduced amount due to the size of the settlement.

[¶ 55] *vii. DOJ Guideline—Settlement Rather Than Trial*

[¶ 56] The False Claims Act does not explicitly reserve a maximum share in the recovery for cases that proceed to trial. 31 U.S.C. § 3730(d) (relevant inquiry is the significance of the relator's contributions); *Northwest Nephrology Assoc.,* 87 F.Supp.2d at 1112. Accordingly, some courts have awarded the maximum share even when the case settled short of trial. *E.g., Mazak Corp.,* 807 F.Supp. at 1353. Other courts have stated that a maximum share should apply only to relators who go through the trial process:

> The argument that the maximum recovery should be reserved for those cases where substantial assistance on the part of the relators continues throughout discovery and trial rather than where settlement is achieved is compelling. Otherwise, if the maximum percentage was awarded in cases that settled, there would be no way to encourage and reward a relator who assists throughout complex pretrial proceedings and a lengthy trial.

*Covington Tech. Co.*, 1991 WL 643048 at *1; *see Int'l Bus. Machs.*, 992 F.Supp. at 142.

[¶ 57] Settlement negotiations themselves can be arduous, and the absence of a trial does not necessarily indicate either brevity or efficiency in the proceedings. Even in resolution short of trial, "[t]he exertion of the parties and their counsel [may be] scarcely less vigorous and combative than a trial of the same action." *Quorum Health*, 171 F.Supp.2d at 1337. A relator should not, therefore, receive a significantly lesser share in the proceeds simply because settlement negotiations were successful. *Id.* This holds particularly true where the relator and his or her counsel play an important role in the settlement proceedings.

[¶ 58] The current case settled short of trial, indicating that Johnson–Pochardt should not receive the full 25 percent share. The case did, however, languish for two years. During this time, Johnson–Pochardt continued to produce documents and was interviewed on several occasions. This mass production of documents and other information was akin to discovery. Circumstances, however, made this process more burdensome than typical discovery. Because the complaint was sealed to all parties for over a year, Johnson–Pochardt had to keep her actions confidential, which increased the difficulty of obtaining necessary documentation. She also had to single-handedly procure the evidence, a responsibility typically borne by the defendants. She carried out these actions, moreover, constantly anxious that the defendants would become aware of her actions and retaliate against her or destroy relevant documents. Although the successful settlement avoided a trial, Johnson–Pochardt did not avoid similar stress and actually bore additional burdens.

[¶ 59] The government's numerous extensions prolonged the action for two years. This length of time resembles the time often needed to prepare for a trial; thus settlement did not necessarily resolve this case any more quickly. Moreover, the magnitude of the information Johnson Pochardt provided and the contributions by her counsel to the settlement proceedings approximates the effort exerted during the process leading up to a trial. Indeed, their active role in the settlement negotiations restored the entire amount the government was defrauded. *Cf. Northwest Nephrology Assoc.*, 87 F.Supp.2d at 1112 (court awarded relator 20 percent since government largely facilitated and negotiated the settlement). Such actions by Johnson Pochardt and her counsel support a large share in the settlement despite the fact that the case settled short of trial.

[¶ 60] **3. The Relator's Share**

[¶ 61] Johnson Pochardt has fulfilled the factors enumerated by the Senate. She has also satisfied nearly every criteria recommended by the DOJ for increasing her share in the proceeds. Only one factor, resolving the case prior to trial, weighs against increasing her share. "Assessed against these criteria, [Johnson Pochardt] deserves a robust share of the settlement proceeds." *Quorum Health*, 171 F.Supp.2d at 1332.

[¶ 62] To summarize, Johnson Pochardt attempted to solve the fraud first by alerting RCRH staff, including RCRH's CEO. *Cf. General Electric*, 808 F.Supp. at 584 (relator's share reduced to 22½ percent because he did not report his suspicions to anyone at General Electric). She provided significant information to the government about a fraud of which it had no prior knowledge. The weight and importance of this information and her knowledge of RCRH's actions "formed the enduring foundation upon which the multi-million dollar recovery stands." *Quorum Health*,

171 F.Supp.2d at 1332. Her attorneys also decisively contributed to the success of this action by substantially assisting the government's investigation for nearly two years. Her attorneys were nearly as prominent as the government's throughout the action, even though the statute assigns primary responsibility to the government. *See* 31 U.S.C. § 3730(c)(1). Johnson–Pochardt and her attorneys played an instrumental role in settling the case for over $6.5 million dollars. *Cf. Int'l Bus. Machs.;* 992 F.Supp. at 142 (court did not increase award above 15 percent in part because the relator opposed the settlement of the matter).

[¶ 63] The revelation of the defendants' fraudulent actions and the settlement obtained came at great financial, emotional, and physical cost for Johnson Pochardt. Indeed, the action was "disruptive and divisive ... on [Johnson Pochardt] and [her] family, including the dispiriting financial hardship and the burden of the confidentiality obligation governing this case ... Only [her] dogged resolution, eventually supported by competent professionals and an occasionally reluctant government, resulted in the millions now available for distribution." *Quorum Health,* 171 F.Supp.2d at 1338. Accordingly, in light of Johnson Pochardt's nearly flawless disclosure of the fraud, her attorneys' crucial contributions, and her personal hardships, this court will award her 24 percent of the settlement proceeds. *See Quorum Health,* 171 F.Supp.2d at 1338 (court awarded relator 24 percent share because of his "uncommon, unusual, and exemplary" contribution).

### CONCLUSION

[¶ 64] "[Johnson Pochardt] performed a service to the United States. Whistleblowers in general perform services to the United States." *General Elec.,* 808 F.Supp. at 584. She actively and uniquely assisted the case, and her attorneys helped facilitate the largest settlement under the Stark Law and largest settlement under the False Claims Act in the District of South Dakota. A 24 percent share in the settlement proceeds will reward Johnson Pochardt for her valiant actions and should "encourage other potential whistleblowers to take risks similar to those taken by [Johnson Pochardt] in this matter to expose fraud against the United States." *Mazak,* 807 F.Supp. at 1353.

[¶ 65] Accordingly, it is hereby

[¶ 66] ORDERED that under Plaintiff's Motion for Award of Realtor's Share (Docket 63), Plaintiff Relator Karen Johnson Pochardt is awarded 24 percent of $6,525,000, or $1,566,000.