AMY TOTENBERG, UNITED STATES DISTRICT JUDGE
I. OVERVIEW
The very last chapter in this protracted False Claims Act litigation is before the Court - Relators' Motion for Maximum Relators Share [Doc. 1340] which the Government opposes. This Order will be the 1350th docket entry in this case.
Relators Victor Bibby and Brian Donnelly initially filed this False Claims Act[1] ("FCA") lawsuit in 2006. They challenged Wells Fargo Bank and a host of other banking institutions alleged fraudulent schemes to overcharge veterans and impose legally impermissible fees in connection with the mortgage refinancing program sponsored by the United States Department of Veterans Affairs (the "VA"). The gravamen of Relators' claims was that Wells Fargo, as well as other banks and mortgage lenders, "repeatedly violated the rules of the IRRRL [Interest Rate Reduction Refinancing Loan] program"[2] by "over-charg[ing] veterans, charg[ing] unallowable fees, and then deliberately conceal[ing] those facts from the VA [Veterans Administration] to obtain taxpayer-backed guarantees for the loans" while at "the same time ... falsely certif[ying] to the VA, in writing, that they were not charging unallowable fees." Fourth Amended Complaint ¶ 5. The Government has never maintained it was aware of any of the Defendants' alleged fraudulent fee concealment practices prior to the initiation of this litigation.
The Government contemplated whether to intervene in this action for approximately five years and requested a total of eighteen extensions within which to determine whether to do so. Relators' counsel sought to bring relevant information to the Government's attention and gain the Government's engagement in the case in the five and a half years prior to the formal lifting of the seal. However, on September 30, 2011, the Government finally filed a notice on the docket, announcing its decision to decline to intervene in this case, after the Court indicated no further extensions would be granted. See 06-cv-547, (Doc. 59). This left Relators to forge ahead on their own.[3] All but two of the defendant financial institutions reached settlements with the Relators and Government within the next year. But the litigation with Wells Fargo and Mortgage Investors Corporation *1348 ("MIC") fiercely moved forward, and the MIC case, in turn was severed and assigned a new case number in 2012 (C.A. No. 1:12-CV-4020).
This case was a bear to litigate and to adjudicate. The printed docket consumes almost a half a ream of paper - 204 pages in total with 1349 separate docket entries prior to the entry of this Order. The entries in turn often include multiple exhibits - and attachments - often as many as 15 to 30 attachments of significant length. The discovery conflicts were so incessant that the Court was ultimately compelled to appoint a special master to assist in resolving discovery disputes. (Docs. 636, 669).
Nothing was easy. Almost every motion took a large volume of the parties' and the Court's time. The Government's election not to intervene further complicated the case, compounding the challenges Relators' faced in obtaining information or documents informally or formally from the VA on an efficient basis. And Wells Fargo was a formidable opponent that threw its vast resources fully in opposition to Relators' challenge at every turn. Thus, Relators and their counsel exclusively were required to lead the litigation charge from September 2011 until August 2017 when the case finally settled for $ 108 million.
The Relators mounted a comprehensive litigation effort. They conducted massive document review -- with Wells Fargo alone producing 1,106,803 documents consisting of 4,124,460 pages of documents in the case. (Peak Affidavit, Doc. 1340-3 at ¶ 7). And they pursued extensive investigation, 29 strategically targeted depositions (excluding Relators' multiple depositions), and endless motion practice initiated both by Wells Fargo and Relators. Relators' counsel actively relied on Relators Bibby and Donnelly's expertise and extensive knowledge of the IRRRL market and Wells Fargo's practices in particular based on their work as licensed mortgage brokers and as officers of U.S. Financial Services, Inc. d/b/a Veterans' Mortgage Company ("USFS"). Relators helped broker thousands of IRRRL loans between 2001 and 2009, the greatest share associated with Wells Fargo. As will be further discussed herein, the two Relators personally played an instrumental role in identifying the fraudulent practices at issue, in filing the charges, as well as participating in the sprawling litigation. They actively participated and guided the document review and analysis, served as expert witnesses, and were each deposed multiple times in their individual and expert capacities. (Affidavit of Relator Victor Bibby, Doc. 1340-2).
The dispute before the Court concerns what percentage share of recovery of the settlement pursuant to 31 U.S.C. § 3730(d)(2) the Relators should be awarded. The Relators have moved for a thirty percent (30%) share, the maximum amount allowed under the FCA (Doc. 1340), based on the claimed exceptional role Relators played in prosecuting this litigation and the outstanding results achieved on behalf of the Government. Relators point to record evidence in support of their argument that their performance amply fulfills the three factors articulated in the Senate's legislative history for determining a relator's share of the recovery, often referenced in other court decisions. See, e.g., U.S. ex rel. Johnson Pochardt v. Rapid City Regional Hosp. , 252 F.Supp.2d 892, 897 (D.S.D. 2003). These factors include: "(A) the significance of the information provided to the Government; (B) the contribution of the person bringing the action to the result obtained; and (C) whether the information which formed the basis for the suit was known to the Government." See S. Rep. No. 99-345 at 28 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5293. And in turn, Relators point to Congress's record finding *1349 that "[i]n those cases where the person carefully develops all the facts and supporting documentation necessary to make the case and presents it in a thorough and detailed fashion to the Justice Department as required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above [the minimum] and up [to the maximum]." 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (cited in Relators' Brief (Doc. 1340-1 at 4) ). Relators in essence contend that the record evidence fills this prescription in spades in this case.
The Government opposes Relators' position. It maintains that Relators' recovery share should be limited to the minimum 25% share authorized under § 3730(d)(2) for relators where the Government has not intervened in the litigation.[4] The Government first and foremost argues that Relators' share should be confined to the minimum amount specified under § 3730(d)(2) because of Relators' personal seal violations that triggered the Court's severe sanction of a $ 1.6 million fine in 2016. See (Sanctions Order of January 5, 2016, Doc. 474). Citing the Court's Sanctions Order, the Government supports its argument by referencing the Court's prior finding that Relators had engaged in a "deliberate and prolonged" breach of the seal commencing in or about July 2009 and had "tarnished" their litigation efforts on behalf of the Governments.[5] Id. at 30, 33. This breach of confidentiality took place after the Government had obtained its eleventh continuance which occurred more than three years after the commencement of the suit, during the thick of the mortgage foreclosure crisis in or about July 2009.
The Government usefully points out that none of the cases approving the grant of a maximum award involved deliberate misconduct on the part of relators, though it acknowledges that counsel for relators had breached the seal.[6] See U.S. ex rel. Rigsby v. State Farm Fire and Cas. Co. , No. 1:06-CV-433-HSO-RWH, 2014 WL 691500, at *7 (S.D. Miss. Feb. 24, 2014),aff'd in relevant part , 794 F.3d 457 (5th Cir. 2015), aff'd in relevant part , --- U.S. ----, 137 S.Ct. 436, 196 L.Ed.2d 340 (2016) (where the maximum 30% share was awarded). The Government argues that the maximum award "should be reserved for only those individuals whose conduct in disclosing the fraud is virtually flawless," citing U.S. v. General Electric , 808 F.Supp. 580, 584 (S.D. Ohio, 1992) (awarding a 22.5% share in a case with Government intervention because although the relator, a manager employed by the Defendant, provided invaluable information to the Government, he failed to timely report his suspicions regarding the fraud or take action - and thus his "silence facilitated the continuation of the fraud for some period of time."). While the General Electric Court's observation and finding under the circumstances in that case are understandable, the "flawless" principle is not embodied as a rigid requirement in the law. Moreover, the Court's application of that principle in *1350 General Electric resulted in its "slight reduction" of the relator's share - as opposed to a reduction of the relator's share to the minimum allowable (15% in a case with Government intervention), as urged by the Government in the instant case. Id. at 584.
Putting aside the gold standard of flawlessness, the Government identifies both the "Senate Factors" and the Department of Justice Guidelines as providing appropriate guidance as to fee share considerations under 31 U.S.C. § 3730(d)(1).[7] The Government notes that some of the Guidelines also bear relevance to § 3730(d)(2) cases. (Govt. Response, Doc. 1343 at 4). The Government criticizes the Relators for not parsing how each of the twenty-five DOJ internal Guidelines[8] might apply in this case. Initially, the Court emphasizes that the district court in U.S. ex rel. Johnson Porchardt correctly pointed out that "[t]he [DOJ] guidelines [ ] are not definitive factors for a court to follow; they are merely internal standards and not federal regulations." U.S. ex rel. Johnson Porchardt , 252 F.Supp.2d at 900 ; see Quorum Health , 171 F.Supp.2d at 1333 (discussing guidelines used by DOJ in particular in assessing the fee share in cases where the Government has intervened and must assess the relative contribution of the relator). In addition, the Government itself refrains here from such a detailed analysis of the Guidelines but instead focuses exclusively on one of the twenty-five Guidelines' explicit identification of a relator's (or his/her counsel's) violation of the FCA procedures as a factor warranting decrease of a share award.
The Government argues finally that the Court should award the minimum of 25% authorized for a non-intervened case on these other principal grounds: (1) the work of the Relators' counsel should not be considered as part of the Court's evaluation of *1351 Relators' work on behalf of the Government; (2) the case did not require exceptional efforts on the part of Relators individually or visit undue hardships on them - and that by FCA litigation standards - the burdens were "entirely unremarkable;" and (3) with a larger a settlement, a "smaller share" award should be sufficient to incentivize future relators while maximizing recovery for the public. (Govt. Response, Doc. 1343 at 11-12).
To be expected, Relators vehemently disagree with each of the Government's points.
II. ANALYSIS AND FINDINGS
The Court is intimately familiar with the course of these proceedings, having been immersed in this litigation for seven years. For this reason, the Court will cut to the quick in setting forth its findings regarding its determination as to the "reasonable" share of the recovery Relators should receive - a determination that falls within the sound discretion of the district court.[9] Alderson v. Quorum Health Group, Inc., 171 F.Supp.2d 1323, 1331 (M.D. Fla. 2001) (citing United States ex rel. Merena v. Smithkline Beecham Corp. , 52 F.Supp.2d 420, 449 (E.D. Pa. 1998) ("In the final analysis, [determining the relator's substantial contribution] can be no more than a judgment call by the decision maker."), rev'd on other grounds , 205 F.3d 97 (3d Cir. 2000).
Section 3730(d)(2) of the False Claims Act provides:
If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall not be less then 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds.
As multiple district courts have found, Congress structured the FCA's Statutory scheme to reward a private citizen's maximum degree of contribution and assistance in the prosecution of an action brought pursuant to the Act. See Alderson , 171 F.Supp.2d at 1335 n. 37 ("The United States asserts that t he size of the recovery in this case supports a reduced relator's share. The statutory language and the legislative history are markedly silent on this, instead focusing only on the relator and his contribution. Limited judicial opinion suggests that the size of the recovery is largely irrelevant."). In the vast majority of cases, where the Government elects to intervene in the litigation, the relator's share of an award is expressly based upon "the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). The primary "measuring stick is the contribution of the relator." U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc., Nos. 05-3450, 10-2039, 11-7767, 2015 WL 4273290, at *5 (E.D. Pa. 2015) ("If Congress had intended limitations, like in the case of large awards, it would have explicitly included them within the statutory framework of the FCA. Congress' silence on this issue compels rejection of the Government's argument.") (citing cases).
*1352 Thus in (d)(1) intervened cases, where a relator "continues to play an active and constructive role in the litigation that ultimately leads to the successful recovery to the United States Treasury, the court should award a percentage substantially above 15% and up to 25%." Alderson , 171 F.Supp.2d at 1332 (quoting 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (statement of Rep. Berman).
Similarly, Section 3730(d)(2) provides for a higher percentage range of recovery for the relator than Section 3730(d)(1) because in (d)(2) cases (far rarer), the Relator assumes exclusive responsibility for the litigation of the false claims case, whereas in (d)(1) cases the government has intervened and typically assumes the primary litigation role, as provided for under the FCA. See § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action....") Consistent with the thoughtful opinions of the district courts in Endo Pharmaceuticals, Inc. , 2015 WL 4273290 at *5, U.S. ex rel. Johnson Pochardt , 252 F. Supp.2d 892 and Alderson , 171 F.Supp.2d 1323, the Court finds that Congress intended the preeminent consideration in the award of a relator's share under the False Claims Act to be the scope of a relators' contributions which resulted in significant results on behalf of the Government. Congress designed the FCA to incentivize and reward a relator's efforts which tangibly make a substantial difference in successful litigation to secure damage awards or settlements based upon defendants' fraudulent conduct. The Court agrees with the court's analysis in Endo Pharmaceuticals, Inc. that "[i]f Congress had intended limitations, like in the case of large awards, it would have explicitly included them...." Endo Pharmaceuticals, Inc. , 2015 WL 4273290, at *5 ; see also Smithkline Beecham Corp. , 52 F.Supp.2d at 450 ("The success of this legislation in continuing to achieve its goals can only be assured by unstintingly providing the qui tam awards dictated by Congress, irrespective of the size of the awards."); Alderson , 171 F.Supp.2d at 1341 ("Congress ... decided that a successful FCA relator deserves an abundant portion of the litigation proceeds. The statutory relator's share may appear in some quarters excessive or inequitable, particularly where the total proceeds are relatively large ... However, Congress has chosen a mechanism calculated to encourage potential relators to undertake the risk and enervating hardship often attendant to FCA litigation.").
The Relators and their counsel were in essence exclusively responsible for the litigation of this case as well as creating the litigation momentum and results that yielded the $ 108 million-dollar settlement on behalf of the Government. The Government does not contest Relators' assertion that they brought valuable information to the Government's attention regarding Defendant's mortgage practices that the Government was not previously aware of. Indeed, as Relators Bibby and Donnelly principally handled Wells Fargo mortgages, they brought a unique and special scope of insider knowledge to the charges they filed. And Relators, based on their experience, brought information both based on their conversations with Wells Fargo representatives and closing agents as well as documentation that reflected the concealment and charging of unallowable attorneys' fees under the rubric of title related fees that were permissible under VA regulations. (Bibby Declaration, Doc. 1340-2 at ¶¶ 4-8). Nor does the Government contest that Relators' evidence that Bibby and Donnelly continued to play an important role in Relators' litigation effort as discussed at length both in Relators'
*1353 briefs in support of its maximum award motion and in Victor Bibby's affidavit. They poured themselves into the review of over 60,000 Wells Fargo HUD-1s and summarized the evidence in documentation attached to their expert report, ultimately identifying 4,097 loans that went to foreclosure and claim on which Wells Fargo allegedly charged unlawful fees. Mr. Bibby estimates that both he and Mr. Donnelly spent approximately 5,135 hours of their time as expert witnesses solely in the case against Wells Fargo. Id. at ¶¶ 10-13. Between March 23, 2016 and August 16, 2016, Bibby and Donnelly each were separately deposed -- two depositions each as fact witnesses and one deposition each as an expert witness -- for a total of 29 hours. (Docs. 939-1, 940-1, 1053-1, 1055-1, 1063-1, 1056-1).
After the Government gave notice of its intent not to intervene, the Government was responsible for only 21 filings on the case's lengthy docket, omitting leaves of absence for the Government's counsel and filings on the fee motion. While the Government filed substantive, helpful briefs in connection with the sanctions issues after Relators' counsel's timely disclosure of their discovery of their clients' seal breach,[10] the Government's other filings were not substantively material. Relators' counsel exclusively were responsible for charting and executing the actual litigation of the case, including extensive briefing, motion practice, depositions and other discovery.[11] They hired their own supplemental experts (beyond Relators). And they deposed eleven different loan closers and closing managers as well as seven Wells Fargo executives located across the country. In short, Relators counsel did, in fact, conduct all the discovery in this case as well as material briefing on the merits.
Relators and their legal team were responsible for the massive, detailed document review required by the case. The Government's counsel ultimately facilitated Relators' access to VA HUD-1 mortgage data, but even this process took almost two years from the date of the original request submitted by Relators' counsel on December 17, 2013. See Relators' brief, Doc. 1340-1 at 17 and Ex. C thereto, Doc. 1340-4. But all other work on assembly and analysis of the mortgage data was handled by Relators and their legal team. Relators' personal work in the case became particularly more intensive and demanding after the Eleventh Circuit dismissed Wells Fargo's appeal of the Court's sanctions order on April 16, 2015, for lack of appellate jurisdiction (Doc. 499) and the litigation went into high gear. The Government's response brief minimizes this document and data review relative to other qui tam or complex cases. The Court disagrees, although it recognizes that there are obviously other large cases that may overshadow the instant one in their document volume. But the scope of the document work here entailed a daunting challenge and Relators themselves were critical in that work. It involved skilled parsing and amplification of the meaning of details of the voluminous mortgage related documents. This work was both consuming and critical to presentation of the Relators' claims.
While the Court has focused on Relators' own contributions, the Court properly also may assess the role of Relators' counsel even though they have been able to *1354 recover fees now from Wells Fargo.[12] Relators' legal team invested their own labor, complex litigation experience and financial resources in the litigation over the eleven years this case was pending, including the six years it was actively litigated. Relators' counsel spent 33,014 hours on the Wells Fargo case alone and $ 1,137,553 advancing funds to cover expenditures.
Finally, the Government does not contest that Relators' team alone negotiated the $ 108 million settlement that the Government, four months later, approved. The effective combination of skilled, experienced counsel and the sustaining, knowledgeable work of the individual Relators led to the valuable results achieved here that benefit the Government and public at large.
In summary, the Court finds that the Relators and their counsel literally constituted the essential engine and source of information for both the initiation and prosecution of this case as well as achievement of abundant results on behalf of the Government. It further finds that considering the Senate factors, the Relators and their legal team significantly contributed and indeed, brought about the results accomplished based on information that the Government was previously unaware of. While the Relators have no control over whether the VA currently or in the future guards for such fraud, this litigation clearly should have had a deterrent impact on Wells Fargo, a seminal player in the national mortgage market.
While some of the DOJ Guidelines are irrelevant and others weigh clearly in Relators' favor, the violation of the FCA procedure remains a negative consideration. Regardless of the DOJ Guidelines, the Court is of the view that it must determine how to weigh the Relators' breach of the seal in its calculus of the appropriate fee share in this case, if at all.
The Court imposed a significant monetary sanction ($ 1.6 million) against the Relators personally - one that was in substantial part based on assessing the impact (in post-tax dollars) of the Relators having already received the benefit of a heightened recovery share for the first cases settled soon after litigation commenced in earnest in 2012. The Court sought to impose a sanction with real teeth and compensatory value for the Government while weighing the reality that Relators' breach of the seal had not resulted in actual disclosure of the litigation to defendants or harm and that dismissal would entail an undue windfall for Wells Fargo. The Relators' personal actions, though, caused an undeniable costly detour in the litigation and in the Court's and parties' time because it necessarily triggered the litigation of serious sanctions issues.
In the Court's view, the sanction should not be doubly imposed given Relators' skilled and determined work to prosecute this case to its conclusion and their achievement of exceptional results on behalf of the Government, with the barest of assistance from the Government.[13] But the *1355 Court cannot disregard the unfortunate detour and true waste of litigation and judicial resources that Relators' seal breach caused in assessing whether the maximum award should be imposed. Still, given the Government's non-intervention decision after securing eighteen extensions over five and a half years and lack of active engagement in this case over the next six years, the Court has strong reason to determine that the important and generous results achieved in this case would never have occurred absent Relators' driven and sustained efforts in this case over an eleven-year period. Balancing all of the evidence and factors discussed herein, the Court therefore has determined that the Relators' share should appropriately be set at 28.5 percent (28.5%).
As a final observation, the Court recognizes that Congress adopted a sliding scale contingency mechanism to encourage relators to assume the mantel of the public interest in FCA litigation as well as the enormous potential financial risks and losses entailed in FCA litigation. The burden and risks of such litigation are great, as are the rewards. That is simply the reality of FCA litigation, especially when the Relator must carry the weight of the litigation effectively alone.
III. CONCLUSION
The Relators' time, effort and overall value to this litigation, as set forth earlier in this Order, cannot be brushed aside. Indeed, without their continued intimate involvement throughout the pendency of this litigation it is highly likely this case would not have ultimately settled. Likewise, as already stated, the Court remains unconvinced by the Government's position and supporting arguments as to why Relators' should only receive a minimum 25% share. Nevertheless, the sanctions detour, which sapped needless time and energy from both the parties and the Court remains a consideration as well. On balance, and after conducting a thorough review of the record, the parties' briefs as well as the relevant case law and given that a determination of what constitutes a fair share of the overall recovery remains solely within the purview of the district court, the Court finds that a 28.5% share serves as an appropriate award in this case. As it is the Court's understanding that the Government has already remitted to the Relators' their 25% share, the Government shall calculate and remit the balance due based upon the Court's judgment as set forth in this Order.
IT IS SO ORDERED this 29th day of March, 2019.

31 U.S.C. § 3729 et seq.

See 38 U.S.C. §§ 3710(a)(8), (a)(9)(B)(i) and (a)(ii) (IRRRL statute).

The case was first overseen by Judge Marvin H. Shoob for approximately the first five years, during which it remained sealed and largely dormant while the government determined whether it would intervene. The case, apparently a proverbial "hot potato" was then transferred, in quick succession, to five different judges in this District, before landing at the feet of the undersigned, who has dutifully overseen the matter from December 16, 2011 through the present-a period spanning over seven (7) years.

The Court's understanding is that the Government has already paid this 25% share to Relators and that Wells Fargo has satisfied its obligation to pay attorneys' fees and costs.

The Government's brief makes no reference, though, to any of the mitigating factors identified in the Court's decision not to impose the ultimate sentence of dismissal.

The Court additionally notes that DOJ's non-mandatory Guidelines expressly reference both relators and relators' counsel in its listing of the factor of non-compliance with FCA procedures. See also discussion of Rigsby in this Court's Sanctions Order, Doc. 474 at 14.

Relators briefly address the DOJ Guidelines in their Reply Brief. See (Doc. 1344 at 6-9).

See United States ex rel. Wittenberg v. Public Utility District , Case No. 3:14-cv-00213-AC, 2016 WL 6518438, at *4 (D. Or. Nov. 1, 2016) (listing all twenty-five guidelines adopted internally by DOJ 31 U.S.C. § 373o(d)(1) cases. Factors favoring a Larger Relator's Share include: (1) The Relator reported the fraud promptly; (2) When he learned of the fraud, the Relator tried to stop the fraud or reported it to a supervisor or the Government; (3) The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the Government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The Relator provided extensive, first-hand details of the fraud to the Government; (7) The Government had no knowledge of the fraud; (8) The Relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) At his deposition and/or trial, the Relator was an excellent, credible witness; (10) The Relator's counsel provided substantial assistance to the Government; (11) The Relator and his counsel supported and cooperated with the Government during the entire proceeding; (12) The case went to trial; (13) The FCA recovery was relatively small; (14) The filing of the complaint had a substantial adverse impact on the relator. Factors Favoring a Smaller Relator's Share include: (1) The Relator participated in the fraud; (2) The Relator substantially delayed in reporting the fraud; (3) The Relator, or Relator's counsel, violated FCA procedures; (4) The Relator had little knowledge of the fraud or only suspicions; (5) The Relator's knowledge was based primarily on public information; (6) The Relator learned of the fraud in the course of his Government employment; (7) The Government already knew of the fraud; (8) The Relator, or Relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation; (9) The case required a substantial effort by the Government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or with little need for discovery; (11) The FCA recovery was relatively large.).

The Government opposes Relators' request for a hearing on their motion for award of the maximum award. Given the Court's familiarity with the record, it doubts that such a hearing would add much beyond an additional decibel "of sound and fury" that already radiates from the briefs. After all, this is not a case where the litigation activity principally occurred behind the curtain of settlement negotiations. The Court thus declines the hearing request, after having already studied the parties' briefs multiple times and having re-immersed itself in the record of this case.

Relators' counsel prompt disclosure of their discovery of the seal breach was not in contention.

While government counsel attended the VA witnesses' depositions, they did not attend any of the other depositions.

The District Court in Alderson addressed the Government's contention that any consideration of the work of relator's counsel would "constitute double consideration of the same effort for two separate recovering" in that case, where the Government had intervened. Alderson , 171 F.Supp.2d 1323, 1334-35. In weighing the contribution made by counsel, the court noted that the record established that Alderson's counsel contributed significantly "and at certain moments crucially to this case" and that this contribution "deserves manifest and telling weight in determining the proper relator's award." Id. at 1335. Indeed, DOJ Guideline 10 expressly recognizes as a factor favoring enhancement whether "the Relator's counsel provided substantial assistance to the Government."

As noted by multiple district court judges, the Government evinces a mysterious hostility to Relators when it comes to resolution of the fee share issues, even when the relationship of Relators and Government counsel have been more positive than in the instant case. See, e.g., Alderson , 171 F.Supp.2d at 1340 (recognizing that "successful" conclusion of FCA litigation often elicits antagonism between the Government and Relator and that Government opposition to Relator requests for fee shares is "perhaps owing to forces that inhere in the structure of FCA actions.").